STATE, Respondent, *v.* JENNINGS, Appellant.

(No. 7,188.)

(Submitted January 3, 1934. Decided January 15, 1934.)

[28 Pac. (2d) 448.]

Cause submitted on briefs of Counsel.

*Mr. M. S. Gallasso* and *Mr. R. F. Leahy,* for Appellant.

*Mr. Raymond T. Nagle,* Attorney General, *Mr. Enor K. Matson,* Assistant Attorney General, and *Mr. H. J. Freebourn,* County Attorney of Silver Bow County, for the State.

82

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Joseph Henry Jennings, has appealed from a judgment of conviction of murder in the second degree and from an order denying him a new trial.

In the early morning hours of February 28, 1933, Jennings killed one Eugene Robinson. The facts and circumstances leading up to and surrounding the killing are substantially as follows: Both men were negroes. Robinson stood six feet one inch and weighed 200 pounds; he was fifty-eight years old, possessed "powerful muscles"—a "powerful physique"—was a family man and peaceable when sober, but quarrelsome, aggressive and "mean" when drunk. Jennings was five feet six inches tall, weighed 155 pounds and was thirty-three years old at the time.

Jennings performed certain services in and about the "Silver City Club," a negro resort in Butte managed by one Frank Yamer. The "Club" consists of a dance-hall, barroom, and

a combination pool-hall and cardroom; between the dance-hall and pool-hall there is an opening in the wall referred to by the witnesses as a "window."

There is evidence to the effect that, on February 21, Jennings had an altercation with a white boy in the "Club," and that Yamer and Robinson intervened. Robinson applied a vile epithet to Jennings, whereupon Jennings struck Robinson with his hand. Yamer and others prevented Robinson from retaliating, whereupon Robinson said, "I'll get even with you; I'll get you when you are not looking." An hour and a half before the fatal encounter, Jennings was in the pool-hall; Robinson, who had been drinking and was in the dance-hall, came to the "window" and threatened to attack Jennings, but was restrained by Yamer and others, whereupon, according to Yamer, Robinson said, "The black son-of-a-bitch needs a knock in the head; kill him"; while other witnesses testified that he said, "If I could get to you I'd kill you, and I'll kill you, if I had a gun I'd shoot you." Yamer further testified that Robinson said that Jennings had struck him a week before, and "I am ready for him, shoot it out or cut it out."

Jennings left the place in company with two friends to avoid trouble with Robinson, and returned after Robinson had presumably gone home; it was then nearly 4 o'clock in the morning. Being cold, Jennings sat on a bench in the rear corner of the pool-hall beside a hot stove, and shortly after his return Robinson came in drunk. After a few minutes of silence Robinson picked up a cast-iron cuspidor and started for Jennings. With the wall at his back, a stove on one side, a poker table on the other, and Robinson in front, Jennings had no avenue of escape. Robinson struck at Jennings' head with the cuspidor; Jennings dodged and came forward burying his head in Robinson's chest, and the two went to their knees. Jennings contends that Robinson had him by the collar and tie and was trying to force him against the hot stove. They were so close together that others were not able to tell just what happened. Jennings took a small pocket-knife from his pocket, opened it with one hand against his knee, and jabbed Robinson with it

seven times, striking him first above the right ear and thereafter inflicting wounds on his wrist, arm and back. Yamer then raised Jennings from the floor and told him that he believed the man was dying, to which defendant replied, "A man is subject to die who hits me with a cuspidor." The whole affray did not last more than a minute. The blow over the ear was at the point where the skull is the thinnest and the blade penetrated to the brain tissue; Robinson died of hemorrhage of the brain on March 3.

Jennings was arrested, charged with murder in the first degree, and finally was brought to trial. He at all times freely admitted the killing, but pleaded self-defense, and all of the efforts of his counsel were directed toward showing that his act was justifiable. In this connection, having testified to threats made by the deceased a week previous and on the night of the affray to kill him, the defendant testified that, as Robinson struck with the cuspidor, he said, "You son-of-a-bitch, I got you," and that, when they went to the floor, "he continued to hold and I got excited and thought he was going to kill me, and I struck every direction with the knife."

As further ground for reasonable apprehension of being killed or suffering great bodily injury, counsel for the defendant sought to show that, about a year prior to the fatal affray, Robinson had had a fight with, and had cut, one Creo Thompson, and that Thompson had communicated the facts to Jennings prior to February 28, 1933. Questions propounded for the purpose of developing this line of testimony were met by objections and sustained by the court.

In the brief of counsel for the state it is not urged that the objections embraced the law, but it is urged that counsel for the defense did not properly follow the court's rulings by offers of proof; that the question of admitting such testimony rested in the discretion of the court, and that, as the defense got before the jury certain testimony on the subject, the exclusion of other testimony was not prejudicial to the defendant. It becomes necessary, therefore, to ascertain just what evidence went to the jury and just how the rulings to which exception

is taken were preceded and followed by a presentation of questions and offers of proof.

Having testified that Robinson was a man about six feet two inches tall and weighed 204 or 205 pounds and was "an active and powerful man," the defendant was asked:

"Now, did you know anything about Mr. Robinson previous to the 28th day of February, 1933, with regard to him being a violent person * * * and turbulent character? A. Yes sir.

"Q. What did you know about him in that respect? A. Well, I was told—

"Mr. Rotering: Objected to as incompetent, irrelevant and immaterial; it has nothing to do with him conveying any threats or anything of that kind."

The court ruled that the witness might testify, subject to the testimony being stricken if not connected up, stating: "You will have to connect this with a threat." A. "I was up in the Club once and I seen what looked like somebody had been shooting at a fake target, or something, and I said, 'What has Frank been doing—' '" whereupon the court sustained an objection that "what was said" was not proper.

The witness thereupon volunteered the statement:

"Well, he shot up the Silver City Club and cut loose his revolver in there, and cut a man.

"Q. Who was the man that he cut?

"Mr. Rotering: That is objected to as without the issues of this case; incompetent, irrelevant and immaterial.

"Court: Sustained.

"Q. When did he cut this man, if you know? (Same objection and same ruling.)"

The defense then made the following offer: "We offer to prove by this witness that the deceased, Robinson, assaulted one Creo Thompson, with a knife, about a year ago, and left a scar upon the face of said Thompson about one and a half inches long, and offer to produce * * * Thompson and exhibit said scar." The same objection as was made to the question was repeated, with the addition, "and is in no way,

manner or method of proving the reputation for peace and quiet of the deceased." This objection was sustained.

"Q. Did you previous to the 28th day of February, 1933, have any communication from any source wherein you learned that Mr. Robinson had assaulted * * * Thompson, inflicting any wounds upon him?

"Mr. Rotering: That is objected to for the reason that counsel should know that his offer has been ruled out. It is objected to as incompetent, irrelevant and immaterial; communications of threats are only competent or proper when they have to do with the defendant himself." The objection was sustained. No offer of proof was made.

Later, while being interrogated with reference to his trouble with Robinson a week prior to February 28, the defendant interjected the statement: "I heard that he would fight; that he cut a man's neck half off." On motion the latter statement was stricken.

At the close of defendant's direct examination counsel disingenuously stated: "For the purpose of the record, I am not sure whether I asked the question previously, but I will ask it again: Did Mr. William Creo Thompson, previous to the 28th day of February, 1933, ever communicate anything to you concerning an assault made by Gene Robinson * * * against him?" The former objection was made and sustained.

Creo Thompson was called as a witness and asked the question: "Previous to February 28, 1933, did you make to Mr. Jennings any communication regarding the slashing—" whereupon counsel was interrupted by Mr. Rotering, as follows: "Just a minute. We object to anything like that, and if it is in keeping with what counsel attempted to show yesterday, then it is incompetent, irrelevant and immaterial." The objection was sustained. The defense then made the following offer of proof: "We offer to prove by this witness that he, prior to the 28th day of February, 1933, told the defendant, Jennings, that the deceased, Robinson, assaulted him from the back with a knife, and slashed his face (the marks of which said slash are on the face of the witness), and that defend-

ant had knowledge of said assault by reason of said communication." Objecting to the offer, the state added to its objection to the question that the fact, if proved, "has nothing to do with any of the issues in this case and is in no way, manner or form proving his defense." The court sustained the objection.

It will be noted that, while the defense succeeded in getting before the jury some evidence as to. Robinson's attack on Thompson and of the defendant's knowledge thereof, throughout counsel's attempts to get the facts fully before the jury, the position of the state and the court that such evidence was wholly foreign to any issue in the case, was no element of the defense attempted, and that the only communications which the jury could consider were those involving threats against the defendant himself, was thoroughly impressed upon the jury, and it is doubtful that any member thereof considered such fragmentary evidence on the subject as was before the jury.

While there is some irregularity as to the time and manner of making the offers of proof, there is no absolute rule of practice to the effect. that assigned error on the exclusion of evidence will not be considered unless the ruling is followed by an offer of proof. The rule in civil and criminal cases alike is merely that, "where an objection to evidence is sustained, and the answer of the witness is not apparent, an offer of proof is necessary to enable the supreme court to review the ruling." (*Trogdon* v. *Hanson Sheep Co.,* 49 Mont. 1, 139 Pac. 792, 793; *State* v. *Popa,* 56 Mont. 587, 185 Pac. 1114.) The purpose of an offer of proof is to advise the court as to the nature of the evidence intended to be elicited by the challenged question, in order to enable this court to determine whether or not the ruling made was correct.

Here there can be no question but that the trial court was fully advised as to the nature of the evidence sought to be presented and which was excluded on the theory that the only evidence of past transactions admissible was that involving threats against the defendant. It is therefore apparent that the court did not exclude the evidence by the exercise

of that legal discretion of which counsel for the state speak, but ruled it out as absolutely inadmissible. On this subject Dean Wigmore, in his invaluable work on Evidence, declares: "The state of the law has come on the whole to favor the admissibility of such facts. Nevertheless, in the majority of jurisdictions, such evidence was, for a long time absolutely excluded. In some instances this was probably due to the notion that the deceased's character is sought objectively to be shown by particular acts, * * * but the real purpose is merely to show such conduct as would naturally excite apprehension, whether it objectively indicates a fixed trait of character or not. Certainly all analogies of the law (apart from the common sense of the situation), favor such evidence; * * * particular deeds of unscrupulous violence may well be deemed relevant to show an apprehension of violence from such a person. The true solution is to exercise a discretion, and to admit such facts when common sense tells us that they could legitimately affect a defendant's apprehension." (1 Wigmore on Evidence, 2d ed., 521.)

Such evidence is admissible only when the defendant has interposed a plea of self-defense (*State* v. *Raice*, 24 S. D. 111, 123 N. W. 708), and when a proper foundation is laid by proof of some overt act justifying such defense. (*Andersen* v. *United States*, 170 U. S. 481, 18 Sup. Ct. 689, 42 L. Ed. 1116; *State* v. *Hanlon*, 38 Mont. 557, 100 Pac. 1035, 1041.) The trial court should exercise a sound legal discretion in determining whether or not the proper foundation has been laid for the introduction of the offered testimony. (*State* v. *Cushing*, 17 Wash. 544, 50 Pac. 512.) However, "as, in personal conflicts, every man is permitted, within reasonable limits, to act upon appearances and to determine for himself when he is in real danger, it would seem to follow, as an inevitable consequence, that whoever relies upon appearances, and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him, and connected with the deceased, which was fairly calculated to create an apprehension for his

own safety." (*Boyle* v. *State,* 97 Ind. 322; see, also, *State* v. *Shadwell,* 22 Mont. 559, 57 Pac. 281; Id., 26 Mont. 52, 66 Pac. 508; *State* v. *Hanlon,* supra.)

In the *Hanlon Case,* the above quotation from the *Boyle Case* is cited with approval, as is the statement from Wigmore (vol. 1, page 248) that "a wise discretion should be the guide, and in all cases where the specific act, by reason of its proximity in time and place, would legitimately reflect upon the conduct or motives of the parties at the time of the affray * * * should be admitted." This latter statement is relied upon by counsel as justifying the exclusion of the evidence, but, on page 518 of his work, Mr. Wigmore declares that "its distance in time from the moment of the affray" does not necessarily destroy its capacity to create an apprehension. Moreover, had the court permitted the development of the line of testimony indicated by the questions propounded and the offers of proof made, it might well have appeared that it was after Robinson's threats made against Jennings on February 21, or a week before the affray, that Thompson communicated the facts to Jennings; the court was merely advised that such communication was made "prior to February 28," and could not have ruled the evidence out on the ground that it was too remote in point of time; nor was such objection urged against it. (*State* v. *Felker,* 27 Mont. 451, 71 Pac. 668.)

As was said by this court in *State* v. *Merk,* 53 Mont. 454, 164 Pac. 655, 657: "The right of self-defense has its foundation in the law of nature"; it is recognized by our Penal Code (sec. 10965, Rev. Codes 1921), and, "if it appeared to the accused at the time of the homicide, as a reasonable person, that it was necessary for him to slay his assailant in order to save his own life or prevent receiving great bodily harm, he had a right to act upon such appearances, and slay his assailant, although he was in no actual danger." (*State* v. *Rolla,* 21 Mont. 582, 55 Pac. 523, 525.)

The deceased was the aggressor, and, although it subsequently developed that he lost his weapon while striking the first blow, that fact shown on the trial did not deprive the

defendant of his right of self-defense, under the foregoing rules. Where the assailant is a much larger and stronger man than the defendant, the latter may reasonably apprehend great bodily harm, even though his assailant is unarmed. (*Hill* v. *State*, 94 Miss. 391, 49 So. 145.) Here the defendant testified that he believed the deceased was endeavoring to push him against a hot stove.

In view of the defense made and the facts and circumstances developed on the trial, tending to show a reasonable apprehension on the part of the accused, the defense was entitled to develop for the consideration of the jury every fact and circumstance known to him and connected with the deceased, entering into and justifying that apprehension.

The court erred, to the defendant's prejudice, in its rulings on the questions designed to bring out all of the facts in connection with Thompson's communication to the defendant ''prior to the 28th day of February, 1933.''

The judgment and order are reversed and the cause is remanded to the district court of Silver Bow county for a new trial.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, STEWART and ANDERSON concur.