STATE, RESPONDENT, v. PALEN, APPELLANT.

No. 8708

Submitted February 17, 1947. Decided March 25, 1947.

178 Pac. (2d) 862

Mr. C. T. Sanders, of Sidney, for appellant.

Mr. R. V. Bottomly, Attorney General, Mr. Clarence Hanley, Assistant Attorney General, and Mr. E. W. Popham and Mr. Desmond J. O'Neil, both of Glendive, for respondent.

MR. JUSTICE ANGSTMAN delivered the opinion of the Court.

Defendant, by information, was charged with having committed the crime of murder in the first degree, alleged to have been committed in Dawson county on the 3rd day of July, 1946, by "willfully, unlawfully, feloniously, premeditatedly and with premeditated malice aforethought" killing and murdering Frank Cavanagh. At the time of arraignment the defendant entered a plea of not guilty. Thereafter defendant and his counsel appeared in court and requested permission to withdraw his plea of not guilty and to enter a plea of guilty. The court permitted the defendant to thus change his plea, but before doing so, elicited from him the fact that he fully understood what he was doing and that he had not been made any promises as to what the punishment might be and that he was acting freely and without any inducement of any kind. The court then set the matter down for hearing to determine the degree of the crime and the punishment to be imposed. The record shows that the plea of guilty was entered on September 10th and the hearing was fixed for September 16th. The court directed the clerk to issue subpoenas for both the state and the defendant for not to exceed five witnesses each, and permission was granted to each side to subpoena additional witnesses upon procuring consent of the court.

The court, after hearing all of the evidence submitted by both sides, reached the conclusion that Frank Cavanagh was "premeditatedly murdered—shot in the back, without warn-

ing, without excuse, without justification and while in the performance of a public duty'' and sentenced the defendant to death by hanging and entered judgment accordingly. The defendant thereupon filed a motion to modify the judgment of conviction so as to substitute life imprisonment for the death sentence. This motion was denied and the defendant has appealed from the judgment of conviction and from the order denying the motion to modify the judgment.

By one specification of error defendant complains of the manner in which the court conducted the hearing. First, the defendant contends that the right to object to questions propounded to the witnesses examined by the state was not afforded to counsel for the defendant and also that the defendant was not afforded the right of cross-examination of the witnesses. There is no merit in these contentions. The record shows that defendant's counsel cross-examined every witness whom he desired to cross-examine and there is nothing to indicate that he was denied the right to object to any questions propounded to the state's witnesses.

He also contends that the court erred in permitting Gertrude Palen, the wife of the defendant, to be examined as a witness for the state. Section 10536, Revised Codes of 1935, prohibits the wife from being examined for or against her husband without his consent. The complete answer to this contention is that the record does not disclose that any objection was made by the defendant either to the competency of his wife as a witness or of her testimony.

Section 10536 also prohibits an attorney from being examined as to any communication made by his client to him without the consent of his client and this court has held that to take advantage of this statute, objection to the competency of the evidence or of the witness must be made. This was the holding in the case of Wilson v. Wilson, 64 Mont. 533, 544, 210 Pac. 896, 900, where the court said: ''Appellant argues that * * * in permitting one W. B. Leavitt, an attorney, to testify to a conversation with him, the court disregarded * * * section 10536,

Revised Codes of 1921 * * *. The point is without merit, and we dispose of it simply by saying that the rule is elementary that a court cannot be put in error where timely objection is not made either to the competency of the evidence or of the witness, as was the case here." To the same effect is Lewis v. Bowman, 113 Mont. 68, 75, 121 Pac. (2d) 162, 166, where the court said: "It is elementary that unless seasonable and appropriate objection is made in such a situation the point is deemed waived."

But had an objection been made to the testimony of Mrs. Palen the result would still be the same. The most that we could do in case of prejudicial error in receiving incompetent evidence would be to set aside the judgment and remand the cause for another hearing on the issue of the proper punishment. This we would not do unless it were reasonably apparent that defendant had been prejudiced by the reception of incompetent evidence. People v. Riley, 376 Ill. 364, 33 N. E. (2d) 872, 134 A. L. R. 1261.

Mrs. Palen's testimony did not bear directly upon the circumstances attending the shooting. Defendant's rights were not prejudiced by her evidence. There was other and competent evidence tending to show deliberation and premeditation in the killing. Mrs. Palen's testimony related only to matters preliminary to the killing and did not in itself establish anything that would tend to aggravate the punishment.

Furthermore the proceeding to determine the punishment is not a trial in the strict sense. People v. Noll, 20 Cal. 164; 24 C. J. S., "Criminal Law," sec. 1983, note 23, page 1205. After the plea of guilty the defendant was no longer clothed with the presumption of innocence. Instead he stood before the court an admitted felon "hoping for mercy but entitled only to justice." People v. Riley, supra [376 Ill. 364, 33 N. E. (2d) 875]. And the court, as in chancery cases, will be presumed to have disregarded incompetent evidence. People v. Popescue, 345 Ill. 142, 177 N. E. 739, 77 A. L. R. 1199.

The defendant asserts that the court made an improper determination of the degree of the crime from the competent evidence before it. We shall not here attempt to set out all of the evidence contained in the transcript which consists of more than 250 typewritten pages. Briefly summarized, the evidence shows that defendant was employed by the Northern Pacific Railway Company as a brakeman on and prior to July 3, 1946, maintaining his home in Glendive; that on the morning of July 3rd at about 1:30 o'clock he came to his home and started a disturbance by calling his wife names and ordering her to get out; that his wife was then in bed; that she thereupon left her bedroom and went to the bedroom of a daughter in the basement of the house and later left the home and sought the aid of a policeman, Mr. Frank Cavanagh. Defendant, soon after reaching his home, went to his son's room where he talked with the son and daughter; that during this conversation he told them he was going to shoot his wife; that thereafter he went to the bedroom which was rented by a roomer but which was unoccupied at the time and took from the dresser drawer a gun; that he put nine loaded cartridges in the gun; that he threatened to shoot his daughter if she called the police; that while the defendant was talking with his son and daughter and after he had procured the gun and loaded it, defendant's wife entered the house with Frank Cavanagh; that Cavanagh exhibited to the defendant a warrant of arrest and advised him that he was under arrest and would have to go with him. At that time defendant had the gun in the lefthand pocket of his trousers. The defendant's daughter then related what happened in connection with the shooting as follows:

"Q. Then what happened after that? A. My mother and Frank walked in. My mother walked ahead of Frank Cavanagh and they came in the kitchen and Frank took off his cap and showed my dad the warrant. He had the warrant in his cap and he told him he was under arrest and would have to go with him and my dad said he would have to go. And then Frank told him to hurry up, he had some other things to do; and

my dad started to walk out with him. Before they started to walk out I tried to tell him he had the gun and Frank didn't understand what I was trying to say. * * *

"Q. Now, when did you see him reaching for his pocket— after they started down the hall, is that right? A. Yes.

"Q. Tell what happened? A. I ran over to my mother to tell her my dad had the gun and as soon as I started to tell her he had already taken the gun out and he started firing and Frank turned around a little bit to see what my mother was saying; and she turned around while he was shooting and we ran outside."

She also testified:

"Q. Now, did you have any conversation with your father after you and he were downstairs before he went to that telephone? A. Well he wanted me—while we were in the bedroom I was sitting on the bed and he was talking to me about— he said then he was going to kill my mother and himself and anyone else that got in the way—anyone else that tried to stop him. * * *

"Q. Was anything said about any officers? A. Well, he said he would kill anyone that tried to stop him— any policeman that tried to stop him and there would probably be nine or ten dead before he got through."

Defendant's son also testified that the defendant stated that he was going to kill the witness' mother and anyone who tried to stop him. The record shows that defendant fired four shots, at least three of which entered the body of deceased. When the shooting occurred Cavanagh was reaching for the door knob to open the door.

The defendant testified that on the afternoon preceding the morning of the shooting he had been drinking; that he first took three drinks out of a bottle of whiskey which he had at the restaurant operated by himself and his wife; that thereafter on the evening of July 2nd he went to the Jordan Bar and there had a number of drinks. He said the bartender was a man whom he always thought of as Thompson and he said

there was another man at the Jordan Bar who drank with him a man who ran the Farmers' Union Market but whose name he did not remember. He did not remember how many drinks he had while at the Jordan Bar. He was there for a couple of hours or maybe longer and while there "drank steady."

He testified that in addition to the manager of the Farmers' Union Market, the latter's brother-in-law and another person were at the Jordan Bar, and they bought some drinks, apparently for the group. When asked whether during the course of the last year he made it a practice to drink extensively, he said: "I never did drink much. I would drink once in a great while—not because I liked it."

The state's witness Harriet Palen, a daughter of the defendant, testified that when her father came to the house on the morning of the homicide, "he was drunk."

Mrs. Palen saw defendant at the cafe around 4:30 p. m. on the evening preceding the morning of the shooting. She said that there was no quarreling between them at the time but that she thought he was not sane and rational at that time.

The son saw defendant at about 9:30 p. m. of the evening preceding the shooting and said he didn't appear the same— that his eyes were bloodshot, although defendant himself said he did not remember seeing his son at that time.

Mr. Goodale, who roomed at the Palen home, said he ate lunch with defendant around 1:30 p. m. on the afternoon of July 2nd and he seemed the same then as usual; that he was awakened by the defendant's son and daughter on the morning of July 3rd and between 2:30 and 3:00 a. m. and walked with defendant to the Northern Pacific depot and the only thing said by defendant during the trip was that "he believed he was dead."

Defendant contends that the court did not consider his evidence of intoxication which he asserts warrants the imposition of a sentence less severe than the death penalty. Our statute dealing with intoxication provides as follows: "No act committed by a person while in a state of voluntary intoxication

is less criminal by his being in said condition. But, whenever the actual existence of any particular purpose, motive, or intent, is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act." Par. 1, sec. 10728, Rev. Codes of 1935.

It is well settled that intoxication on the part of the accused ██ in a prosecution for homicide should be taken into consideration, "not for the purpose of excusing or mitigating the killing, but for the purpose of determining whether the accused was capable of entertaining the purpose, intent, or malice, which is an indispensable ingredient of certain grades of the offence." 26 Am. Jur., Homicide, sec. 118, p. 235. And the clear weight of modern authority is to the effect that if a person who is charged with murder in the first degree was intoxicated when the offense was committed to such an extent as to render him incapable of entertaining the purpose, intent or malice requisite for first degree murder, the crime is reduced to second degree murder. See 13 Rul. Cas. Law, sec. 18, p. 717 et seq.

Deliberation and premeditation added to the unlawful killing ██ with malice aforethought constitutes murder in the first degree. State v. Fisher, 23 Mont. 540, 59 Pac. 919; State v. Cates, 97 Mont. 173, 33 Pac. (2d) 578. And "the purpose to kill may be formed the moment before it is executed as well as for an hour or a day, and still the act be premeditated." Id., and see People v. Bellon, 180 Cal. 706, 182 Pac. 420.

But as above noted, one who is intoxicated to the extent of being deprived of mental capacity to deliberate or premeditate cannot be guilty of murder in the first degree unless he formed the purpose to kill before becoming intoxicated.

The record fails to disclose any motive on the part of the ██ defendant for the killing of Frank Cavanagh. There is no motive shown for his stated purpose to kill his wife. The lack of any such motive, it seems to us, tends somewhat to cor-

roborate defendant's testimony that he was so far under the influence of intoxicating liquors at the time of the homicide that he did not realize what he was doing. His evidence was to the effect that he did not remember anything that happened relating to the shooting. The court of course was not obliged to believe his testimony (State v. Jochim, 55 N. D. 313, 213 N. W. 484) except in so far as it was corroborated by other credible evidence or by facts and circumstances. As above noted there are some circumstances and some direct evidence tending to corroborate his testimony that he was intoxicated at the time of the shooting. On the other hand, some facts and circumstances tend to refute his claim that he was so far intoxicated as not to know or understand what he was doing at the time of the shooting. Persons claimed to have been drinking with defendant were not called as witnesses.

We think under the circumstances of this case the trial court should hear additional evidence on the point of the extent of the drinking done by the defendant on the evening in question and the degree of his intoxication. If the defendant drank as extensively as he says he did it seems to us he should be able to furnish some corroboration of his testimony, either through the manager of the Farmers' Union Market, the latter's brother-in-law, or the bartender who served the drinks, or others present. Likewise it seems to us, further evidence ought to be within the power of the parties to produce, bearing upon the extent of his intoxication at the time of the shooting. The daughter who was called by the state as a witness said the defendant was drunk when he came to the house but she was not asked to relate the facts upon which she based her opinion nor did she give any information on the subject from which the court could reach a decision as to the extent of intoxication or whether the drinking was sufficient to dethrone the reason.

While we do not hold the trial court committed reversible error, yet we have some doubt on the question of the extent of defendant's intoxication at the time of the homicide and we

think, in view of the gravity of the offense involved and the seriousness of the question so far as the defendant is concerned, full justice can be done to the defendant and to the state by remanding the cause to the district court for the purpose of hearing further evidence on the issue of the defendant's mental condition at .the time of the homicide, produced by alleged intoxication.

It is so ordered.

Mr. Chief Justice Adair and Associate Justices Choate and Cheadle concur.

Mr. Justice Metcalf (dissenting).

Defendant was charged with the murder of Frank Cavanagh, a policeman, on July 3, 1946. On July 9, 1946, leave was granted to file an inforamtion direct. The information was read in open court and a copy delivered to defendant. The defendant stated that he did not have counsel to represent him, that he was without means to employ counsel and after being advised by the court, said that he wanted the court to appoint counsel. Thereupon counsel was appointed and July 13, 1946, set as the date of arraignment. On that date the defendant appeared in court with his counsel and entered a plea of not guilty. Thereafter on September 10, 1946, defendant with his counsel appeared in open court, advised the court that he wished to withdraw his plea of not guilty and enter a plea of guilty. At that time the court examined the defendant as follows:

"Q. You know that you are charged in this case with first degree murder? A. Yes, sir.

"Q. Do you know that the punishment for that crime may be either life imprisonment or death by hanging? A. Yes, sir.

"Q. Have you been promised or have any promises been made to you as to what punishment would be inflicted if you made a plea of guilty? A. No, sir.

"Q. Have you been threatened in any way or in any manner as to what punishment might be inflicted did you not plead guilty? A. No, sir.

"Q. The desire then, on your part, is entirely voluntary? A. Yes, sir.

"Q. And it is freely made—is it freely made? A. Yes, sir.

"Q. And without inducement of any kind? A. No, sir.

"Q. No consideration—procurement consideration of any kind have been made? A. No, sir.

"Q. You understand that it is not the custom in this district, upon entering a plea, that the entering of a plea in any way affects the punishment which may be inflicted—you understand that? A. Yes, sir.

"Q. Very well. The court now inquires of you, what is your plea to this information, guilty or not guilty? A. I plead guilty."

The court set September 16, 1946, as the date for the hearing provided by section 12056, Revised Codes of 1935. It was at this hearing that the record of 250 pages mentioned in the majority opinion was made and it is on this record that the matter is now before this court.

It is well settled that the trial court has discretion in fixing sentence within the limits prescribed by law (24 C. J. S., Criminal Law sec. 1878) and that this discretion will not be interfered with except for manifest abuse of this discretion. State v. Fowler, 59 Mont. 346, 355, 196 Pac. 992, 995, 197 Pac. 847. In that case the court said: "After reading the evidence, keeping in mind that the defendant was not represented by counsel, we are inclined to the opinion that the penalty inflicted was severe. Nevertheless this is a matter with which this court has nothing to do. If the defendant desires relief in this regard, he should apply to the executive department of the government, in which is lodged the power of commutation or pardon."

In these cases where a plea of guilty admits all the facts and the sole question to be determined is the degree of the crime and the punishment to be imposed, the appellate court is only concerned with determining whether the discretion of the trial court was judicially exercised. Commonwealth v. Frisbie, 342 Pa. 177, 20 A. (2d) 285; People v. Hawk, 17 Cal. (2d) 812, 112

Pac. (2d) 225; People v. Lang, 2 Cal. (2d) 417, 41 Pac. (2d) 165; State v. Sullivan, 230 Iowa 817, 298 N. W. 884.

There is evidence in the record that appellant was intoxicated. The majority decision points out that intoxication is only to be considered "for the purpose of determining whether the accused was capable of entertaining the purpose, intent, or malice, which is an indispensable ingredient of certain grades of the offense." Citing 26 Am. Jur., sec. 118. This is the statutory rule in Montana by virtue of paragraph 1, section 10728, Revised Codes of 1935. It is commonly known there are various degrees of "intoxication" or "drunkenness." Tracy v. Brecht, 3 Cal. App. (2d) 105, 39 Pac. (2d) 498; State v. Yates, 132 Iowa 475, 109 N. W. 1005. And to say that a person is intoxicated may mean much or little. It indicates nothing as to the degree of intoxication. Brethony v. Pottsville Union Traction Co., 218 Pac. 123, 66 A. 1006. But intoxication excusing a criminal act must be such as to render the accused incapable of forming the felonious intent which is a necessary element of the crime. Collins v. State, 115 Wis. 596, 92 N. W. 266.

"It follows that a defense to a crime involving intention cannot be established by merely showing that the perpetrator, was, at the time, intoxicated; he must go farther, and make it appear that his intoxication had progressed so far as to rob him of his mental faculties * * *. Stated in another way, a man may be drunk, but his responsibility for crime continues while he retains control of his mental faculties sufficient to appreciate what he is doing." State v. Yates, supra [132 Iowa, 475, 109 N. W. 1006].

The appellant testified that he had been drinking on the day of the shooting, that he arrived in Glendive about one o'clock p. m., went home and cleaned up and then went down to the restaurant run by himself and wife and ate lunch. Then he went over to a wholesale house and bought some sugar and brought it back to the cafe. He stayed in the basement awhile "checking over things and seeing what was in stock" and then went upstairs and took three drinks out of a pint bottle of

whiskey. He then left the cafe about 4:30 or 5:00, went to the Oasis where he had nothing to drink and after a short time went to the Jordan Bar. He "drank steady" until about 8:00 or 8:30 p. m. Except that he remembered that he returned to the Oasis a second time, that he went home and was in the hallway outside the bathroom and that he was arrested after the shooting, he alleged that he was unable to recall any of the events that led up to the fatal shooting, the actual shooting itself or what took place after the shooting and before his arrival at the lunchroom where he was arrested. There was other evidence as to his drinking. After he came home and frightened his wife, she ran out to get the police and swore out a complaint which recited that the appellant was drunk. The appellant's daughter, Harriet Palen, testified that her father was drunk when he came home. His son saw him on the street about 9:30 p. m. and testified that at that time his eyes were bloodshot and that later just before the shooting his father's eyes were still bloodshot.

Mrs. Palen testified that the appellant came home about 1:20 a. m., that he came into the bedroom and called her names and ordered her out of the house. She fled to her daughter's room in the basement and later crept out to call the police. After obtaining a warrant from the police magistrate she returned with the deceased, Frank Cavanagh, the policeman detailed to make the arrest. They entered the house by the front door and saw the appellant and his daughter Harriet in the kitchen. Her testimony continues:

"Q. What happened after that? A. Then Mr. Cavanagh talked to my husband and told him he would have to go with him. At first he said he wouldn't.

"Q. At first your husband said he wouldn't? A. Yes.

"Q. Well, did Mr. Cavanagh, if you remember, say anything about any papers? A. He didn't the first time he asked him. Then he asked him the second time. He said he would have to go with him and then he showed him the warrant.

"Q. Did he take off his cap? A. Yes.

"Q. And did he show the warrant to Mr. Palen? A. Yes.

"Q. Tell what happened after that? A. I don't think he said anything then, but he started to walk into the hallway and my husband kind of followed him.

"Q. Who was ahead? A. Frank, Mr. Cavanagh.

"Q. Now, Mr. Cavanagh started walking into the hallway and your husband followed him. Is that right? A. Yes.

"Q. Where were you standing? A. I was standing just where I was, right behind him when he stood at the stove.

"Q. And where were you with reference to this door? A. I was standing by the stove when he was walking out.

"Q. Did you move? A. No.

"Q. Well, could you see your husband and Mr. Cavanagh walking down the hall? A. Yes, I could.

"Q. Tell what happened? A. Well, when they got to the door, Frank, Mr. Cavanagh, was going to open the door and then I saw my husband draw the gun.

"Q. Did you notice from which pocket he drew it? A. No.

"Q. Did you see the gun? A. I saw part of it.

"Q. What part did you see? A. The barrel part of it.

"Q. Where was it when you saw it? A. It was above his shoulder.

"Q. Demonstrate how he held it, if you can? A. I saw it when he raised it up like that. (Indicating with arm raised so that barrel of gun would appear over shoulder.)

"Q. Was your husband in front or behind Mr. Cavanagh at the time? A. He was behind.

"Q. Had he said anything that you know of? A. No, he didn't say anything.

"Q. Tell what happened? A. Oh, when I saw the gun I screamed and said: 'Oh, my God, he has a gun.' And my daughter and I run out the side door."

Harriet Palen, appellant's 15 year old daughter, was awake when her father came home between 1:00 and 1:30 a. m. She was asked what happened when her father came home and her answer was: "When he came home he walked in the house

and he was drunk. He started shouting names and called my mother names and told her to get out and she came downstairs.'' She then heard her father coming downstairs and she met him on the stairs and when he asked if her mother was down there she said her mother was not there. Her father then went outside and after looking outdoors for him, she met him in the hall as he re-entered the house and they went together upstairs to her brother, Clifford Palen's room. Her brother was asleep but awakened after she opened the door. They talked awhile and the appellant then went into the next room, rented by a man named Steele.

She further testified:

''Q. What did you and your father talk about while you were up in your brother's room. A. He just kept saying he was going to shoot my mother or kill my mother.

''Q. Did he say why? A. No. Not that I can remember.

''Q. Then after your father was in there talking to you you say he went into Mr. Steele's room? A. Yes.

''Q. Was Mr. Steele there? A. No.

''Q. How did your father find out whether or not he was there? A. He rapped on the door and called his name.

''Q. And there was no answer? A. No. * * *

''Q. All right. Now what did your father do when he went into Mr. Steele's room? A. He sat on the bed—no, he pulled out the dresser drawer and took the gun.

''Q. Did you see that? A. Yes.

''Q. Where were you then? A. I was standing in the doorway.

''Q. By the 'doorway' you mean that doorway there? A. Yes.

''Q. You followed him that far? A. Yes. My brother told me he thought he was going after the gun so I went in and watched and he did take it.

''Q. You say he pulled out the dresser drawer and got the gun? A. Yes.

''Q. Had you ever seen that gun before? A. Yes.

"Q. When? A. When I was cleaning his room it was on the dresser.

"Q. On the dresser or in it? A. On it.

"Q. Then did you, yourself, see your father take that gun out of the dresser drawer? A. Yes.

"Q. Then what happened after that then? A. He sat on the bed and loaded it.

"Q. Where did he get the shells? A. Out of the same drawer.

"Q. Did you see him load it? A. Yes.

"Q. Did you see how many shells he put in it? A. Nine.

"Q. Did you see him? A. Yes.

"Q. Put all of those shells in? A. Yes.

"Q. Did he say anything to you while he was doing that? A. I don't remember. I don't think he did.

"Q. Did you say anything to him? A. I don't remember.

"Q. What did you do after that? A. I started down the stairway.

"Q. And then what happened. A. He told me to come back up. I wasn't supposed to call the police. He would shoot me if I did.

"Q. Then what happened after that? A. We went back in my brother's room and then my father wanted a cigarette so I went downstairs to get it for him and then he went downstairs and smoked a cigarette; and he went in the kitchen and told me to go down to the beanery with him and have a cup of coffee, and I wasn't dressed and wasn't ready to go. Then he started looking in the telephone directory for a number and while he was doing that my mother and Mr. Cavanagh walked in. * * *

"Q. Now, did you have any conversation with your father after you and he were downstairs before he went to that telephone? A. Well, he wanted me—while we were in the bedroom I was sitting on the bed and he was talking to me about —he said then that he was going to kill my mother and himself

and anyone else that got in the way—anyone else that tried to stop him.''

Clifford ·Palen testified to the same effect as to the appellant's knocking on the door of Steele's room to see if anyone was there and then going in. His testimony as to his meeting with his father at 9:30 p. m. is significant.

''Q. Where did you see him? A. On the street in front of the theater.

''Q. Did you talk to him? A. Yes I did.

''Q. How long was that before you went home and went to bed? A. About an hour.

''Q. Did he appear to be the same as you had always seen him at that time? A. No.

''Q. How is that? A. No, his eyes were bloodshot.

''Q. What did he say to you then? A. He asked me if my mother was at the cafe.

''Q. Did he talk distinctly? A. Yes.

''Q. Was he alone there in front of the theater? A. No, there was another man with him but I don't know who.

''Q. Then when—going back now to your house and when your sister and your father came in and you woke up, did you notice anything strange about your father at that time? A. His eyes were still bloodshot.

''Q. During the time he was talking with you and your sister did he appear to be the same as you had known him at other times? A. His eyes were bloodshot.

''Q. Was that the only thing you noticed about him that was different? A. Umm-humm.''

Grace Kalberg, waitress at the Northern Pacific lunchroom, testified as to appellant's actions in the lunchroom after the shooting:

''Q. Did you notice anything unusual about him when he came in? A. No, I didn't.

''Q. What did he do when he came in? A. Just asked for a cup of coffee.

"Q. I see, and then what did he do after that? A. He sat and talked—do you want me to tell what he said?

"Q. Did he have more than one cup of coffee? A. Yes. Vera Fleischman gave him the first cup and he asked for another one and I gave him the second one.

"Q. Then did he talk to you? A. Yes, he called me over.

"Q. He called you over? A. Yes.

"Q. What did he say to you? A. Well, he said he did the worst thing he ever did in his life. He said: 'the worst thing that could ever happen to me—I killed a man.'

"Q. What did you say? A. I said: 'No, I didn't think that could be possible.' I said. And he said: 'Yes, I did.'

"Q. Did he say anything else? A. Well, he thought he would go out and kill himself and I said I didn't think he should, he would be yellow and I thought he had better face the music.

"Q. Did he tell you who he killed? A. No, he didn't.

"Q. Well, what happened after that? A. Well, then he sat awhile and then he went over to the telephone.

"Q. Well, did he say anything more about something breaking? A. Yes. He said something about it had been on his mind for five or six months—I don't know just the words he used. I can't remember.

"Q. Then you said he used the telephone? A. Yes.

"Q. Did you hear who he called? A. No, I didn't.

"Q. Did he just use it once? A. About three times, I think.

"Q. Did anyone else come after him then? A. Nobody but the sheriff.

"Q. I see, and where was Mr. Palen when the sheriff came after him? A. He was sitting at the telephone.

"Q. What happened then? A. Well, I don't know. They just come in behind him and told him to put his hands up.

"Q. Did Mr. Palen put his hands up? A. Yes.

"Q. Did you hear him say anything more then? A. No. One time, I think, he dropped them and Martin told him to get them up.

"Q. And you didn't hear anything more that he said? A. No, 1 didn't.

Willa Webster, the telephone operator on duty, heard the appellant call in from the lunchroom sometime after 2:00 a. m. She recognized his voice:

"Q. Did he tell you who it was? A. No, he didn't.

"Q. Repeat, as nearly as you can, exactly what was said over the telephone? A. Mr. Palen asked if there was any calls from his home for the police and I told him no, and I said: 'Have you had any trouble? And he said: 'Yes, I have. I have done something terrible. I am sure sorry for what I have done. I shot an innocent man.'

"Q. Did he say who it was? A. No, he didn't.

"Q. Did he say anything more? A. No.

"Q. Did you ask him if he killed the man? A. Yes, I did.

"Q. What did he say? A. He said 'Yes, I looked at him and he was dead.'

"Q. Then he said he was an innocent man, is that right? A. Yes.

"Q. What was it he said about being sorry? A. He said he was sorry he done it. He didn't know why he done it because he was a good man.

"Q. Well, did he ask you to telephone for him in any way? A. Yes, he did.

"Q. What did he say? A. He said: 'I wish you could help me in some way.' 'Well,' I said, 'it is too late now; you had better call the sheriff.' Then he told me to call the sheriff then.

"Q. He told you to call the sheriff? A. Yes.

"Q. Did he tell you where he was? A. I knew where he was. The call came from the lunch room.

"Q. Could you tell from your position that it was from the lunch room? A. Yes.

"Q. Well, did Mr. Palen call you more than once? A. Yes. He called me three times.

"Q. Well, did he say anything different the second time?

A. Well, the first time he called me and told me what he had done and then he called me a third time. I forget what he said the second time.

"Q. Was it something about killing someone? A. Yes, and then the third time he called he said: 'I think I will place a long distance call.' And then he started to place the call and just then I guess it was at that time that the sheriff came in because it was cut off right there before he said anything more.

"Q. Well, each time he called you what was his name for you? A. Billie.

"Q. He called you 'Billie.' A. Yes.

"Q. Did he say anything about shooting himself? A. He said: 'I suppose I should shoot myself, but I want to live for those little ones,' he said.

"Q. Did he say why he wanted to live for the little ones? A. He said they just pleaded with me pathetically and I feel like I should live for their sake.

"Q. Did he say what they plead with him about? A. Not to hurt their mother."

Martin Kalberg, the sheriff who arrested the appellant, searched him and among other things found a partially filled pack of cigarettes with twelve .22 shells in it. These were identified as the same type shells that were in the pistol and the same type that were kept in Steele's room.

As against the appellant's testimony that he was drunk and unable to recall any of the occurrences of the evening, we have affirmative evidence of his actions on the evening in question. Palen recalled that there was a pistol in Steele's room and was able to go to the dresser where it was kept, load it to capacity and take extra cartridges in the cigarette package. He talked distinctly when his son saw him on the streets and the only thing about him that seemed different was that his eyes were bloodshot. He talked with his daughter after he had loaded his pistols and kept her with him so that she could not call the police. He refused to go with Cavanagh until after Cavanagh

produced and showed him the warrant for his arrest. He expressed remorse and indicated he knew the seriousness of his action when he talked with Grace Kalberg in the lunchroom. He talked to Willa Wester over the phone, called her by name, his voice was normal so that she was able to recognize it and identify him and he declared that he had killed an innocent man, that he was sorry and that the deceased was a good man.

All these actions took place during the time he was allegedly suffering from loss of memory. Certainly with such evidence in the record we cannot say there was a manifest abuse of discretion in holding that the accused was not so intoxicated as to be incapable of forming the felonious intent necessary for a conviction of murder in the first degree.

A quotation from State v. Treficanto, 106 N. J. Law 344, 146 A. 313, 316, is in point: "It is pertinent to observe in this case that a man who could go from his room to Caputo's and return several times, as Treficanto did; deliberately go there for his pistol and go back and use it in an endeavor to shoot Caputo, is evidence from which the jury could conclude, and doubtless did conclude, that Treficanto's faculties were not so far prostrated by intoxication as to render him incapable of forming an intent to kill."

Evidence of intoxication should always be received with great caution and carefully examined in connection with other proven circumstances. I Warren on Homicide, Perm. Ed., 205.

"The weight to be accorded to evidence of intoxication, and whether such intoxication precluded the accused from forming a specific intention to kill and murder, which intent is a necessary element in murder in the first degree, are matters essentially for the determination of the trier of the facts." People v. Lami, 1 Cal. (2d) 497, 36 Pac. (2d) 192, 193; State v. Treficanto, supra.

It is a serious undertaking to determine the degree of a murder and to impose punishment. The statutes and decisions have made it mandatory to hold a hearing to ascertain the degree and discover circumstances in mitigation or aggravation.

The trial court has scrupulously adhered to these statutes and at every stage protected the rights of the accused. The trial judge conducted this hearing; weighed the evidence; passed on the credibility of the witnesses and assumed the solemn burden of imposing the sentence. Frank Cavanagh was killed while carrying out his duties as a policeman. He was in full uniform, had a valid warrant of arrest and apparently his murderer had full knowledge that he was being arrested. At least three and possibly four shots were fired.

In pronouncing judgment the court declared: "I have given this matter considerable thought. I have received and analyzed the testimony that was introduced and have come to the conclusion that Frank Cavanagh was premeditatedly murdered—shot in the back, without warning, without excuse, without justification, and while in the performance of a public duty. Having come to this conclusion I feel that the Court would be derelict in its duty would it not or did it impose any sentence other than that about to be pronounced."

In determining that the accused was guilty of murder in the first degree the court has determined that the accused was not so intoxicated as to be deprived of the ability to form the requisite intent. There is evidence in the record to sustain his decision.

To remand this case for further hearing of evidence which would be cumulative in character is an unwarranted interference with the discretion imposed in the trial court.

The judgment should be affirmed.