STATE OF MONTANA, Plaintiff and Respondent, *v.* ROY A. BROOKS, Defendant and Appellant.

No. 11322.
Submitted November 30, 1967. Decided December 28, 1967.
436 P.2d 91.

400

John T. Mullaney (argued), John A. Alexander (argued), Butte, for appellant.

Forrest H. Anderson, Atty. Gen., William A. McCormick, Asst. Atty. Gen. (argued), Helena, Mark P. Sullivan, County Atty., Butte, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment of conviction for the crime of second degree murder and a sentence of 40 years in the state prison entered against the defendant Roy Als Brooks. The judgment is pursuant to a verdict of "guilty" rendered in the district court of the second judicial district, the Honorable John B. McClernan, District Judge presiding, sitting with a jury.

The defendant was charged with the crime of first degree murder by an information filed in the district court on April 27, 1966. The purported crime arose out of the death of one Jess Villalovis on April 26, 1966, in Butte. The trial of the case commenced on September 12, 1966, and on September 20, 1966, it was submitted to the jury. The jury returned a verdict finding the defendant guilty of murder in the second degree and fixing punishment at ten years and one day, without parole. Judge McClernan refused to accept the verdict in the form returned explaining that the words "without parole" invaded the province of the parole board. The jury returned to the jury room and upon further deliberation returned a verdict of guilty of second degree murder, leaving the punishment to be fixed by the court.

On September 23, 1966, the defendant was sentenced to a term of 40 years in the State Prison at Deer Lodge. Defendant made two motions for a new trial, which were denied, and he then appealed.

The circumstances leading up to and surrounding the violent

death of Jess Villalovis in his apartment on Porphyry Street in Butte reveal a drama not unlike the plot of a sordid grade "B" movie. The principal characters, save of course the deceased, placed their versions of the tale before the jury and we are forced to review them here.

One Benito Sandoval, known as "Benny," was a friend of the deceased. He stated at trial that on the day of the crime he first saw the victim very early in the morning at the Board of Trade Bar. The two men played pool and drank beer for a time and then proceeded to a restaurant and ate. From there they went to the victim's home on Porphyry Street. They arrived at about 5:00 a. m. The men had a pint of whiskey with them and they "had a few drinks" before going to sleep.

The building where the deceased lived and where he died consists of six apartments. Here, we are concerned with three of them. On the ground floor are the apartments occupied by the defendant Brooks and his wife and that of one Jay Smith and his wife. The part of the Smiths, and their apartment, will be set out in due course. On the second floor, above the Smiths, lived the deceased with his wife Anne. (While there is some question as to whether Anne was actually the wife of the deceased, it is not important to this appeal.) Leading to this second floor apartment there is an outside stairway on the west side of the building and a narrow inside stairway near the kitchen of the apartment.

The morning of the crime, Jess Villalovis and Benny Sandoval were sleeping in a room on the ground floor of the building. Apparently, when Jess had been drinking, his wife was often reluctant to let him in the apartment so he slept downstairs on these occasions. At around noon the two men went upstairs to the Villalovis apartment. Almost immediately thereafter Benny went out and bought a fifth of whiskey and returned to the apartment with it. The three people, Benny, Jess and his wife Anne, proceeded to drink all of this bottle. At around 3:00 o'clock in the afternoon Benny went out and

bought a second fifth, returned with it and they continued drinking.

About 4:00 p. m. Benny and Anne went downstairs to check on a suspected leak in a gas pipe. There they met the defendant Brooks. Brooks stated at that time and later at the trial that when he met Benny and Anne he had already consumed a pint of whiskey that day and was partially drunk at that time. The defendant returned with Benny and Anne to the apartment and with the deceased they finished the second bottle of whiskey.

When the liquor ran out Benny made another trip and this time he returned with two fifths of whiskey. The party continued.

At about 4:30 p. m., the defendant's wife, Mary Brooks, came to the apartment. She started drinking with the others. From the testimony it is apparent that all of those in the apartment, with the exception of the defendant's wife, were in an advanced stage of intoxication as a result of their drinking.

What is set out above is substantially in accord with the testimony of all of the witnesses. There is some dispute as to the details which follow, as we will set out.

There had been, previous to the day of the murder, some hostility between the deceased and the defendant. According to the testimony of Benny Sandoval and Anne Villalovis, the deceased and defendant argued off and on during the drinking party and that several times the deceased told the defendant to leave. Benny testified that the argument varied in intensity. He stated that at one point the deceased went into the kitchen and that he had an impression, rather vague because of the alcohol, that the deceased there secured a knife and started toward the defendant. Benny says he told the deceased not to cause trouble and he went back into the kitchen. Benny stated he did not actually see the deceased with a knife but thought he might have had one. Anne said she was in the kitchen most

of the afternoon and that she had no knowledge of this happening. The defendant knew nothing of the incident.

According to Benny and Anne, the defendant at various times during the afternoon acted crazy and danced around the room in a strange way. They said that at different times the deceased and the defendant would argue and the deceased told defendant that he would have him arrested and that he wanted the defendant to leave.

Benny Sandoval testified that he heard the deceased and defendant arguing and then went to sleep in a chair. He testified that he woke up some time later when he heard some noise. On awakening he saw Jess Villalovis slumped over bleeding. He heard Anne Villalovis screaming and saw her wrestling with the defendant. He states that the defendant had a knife in his hand at that time. He then ran from the apartment.

Anne Villalovis testified that she had had quite a bit to drink. She says she spent most of the afternoon in the kitchen preparing a meal. She testified that the deceased entered the kitchen several times during the afternoon to get ice from the refrigerator, but she at no time saw him pick up a knife.

Mrs. Villalovis stated that some time after the wife of the defendant joined the party the deceased again told the defendant to leave and he started to do so. He called his wife to go with him—she refused. The defendant then left the apartment alone. He returned a few minutes later. The deceased seeing the defendant come through the door said he was going to call the police. The deceased then started towards the telephone. The defendant advanced and the two men met near the telephone. Mrs. Villalovis says she saw the defendant strike out at the deceased and the deceased then slumped to the floor. She did not see a knife in the hand of the defendant.

Anne then says that defendant attacked his wife next and said that he was going to kill her. Mrs. Villalovis came to the aid of Mrs. Brooks, the three of them wrestled and the defendant pushed his wife down the stairs. Mrs. Villalovis then

went to her husband and saw that he was bleeding—she screamed. She says that she tried to wake her husband up but he seemed dead. She says that the defendant told her not to use the phone and that after that she did not see him again until after the police had arrived. She does not remember at any time seeing the defendant with a knife.

Jay and Mary Smith occupy an apartment on the lower floor of the building where the crime occurred. On the day of the murder Mr. Smith testified that he did not know what was happening upstairs. Later in the afternoon he heard a knock on his kitchen door. He opened it and the defendant charged into the room swinging a knife, yelling that he had just killed Jess Villalovis and that he was going to kill Smith. The two men fought and Mr. Smith states he knocked the knife out of the defendant's hand and it flew under the stove. Smith then hit the defendant and knocked him out the door.

The defendant, Brooks, testified in his own behalf. He admitted that there had been some trouble between himself and the deceased prior to the day in question but denied that there was any argument between them that day. He also said that the deceased did not tell him to leave the apartment during the drinking party. He says that he had quite a lot to drink during the afternoon. He states that the deceased started laughing at him so he thought he had better go. He called to his wife to come with him and the two of them started to leave. He says his wife was walking in front of him and she suddenly stopped and he accidentally ran into her and knocked her down the stairs. He remembers going to help his wife and then he remembers nothing until the police arrived.

The police came on the scene at about 7:45 p. m. They found the wife of the defendant at the bottom of the stairs on the inside of the building. The defendant was in his apartment. Anne Villalovis was sitting at the kitchen table in her apartment and Jess Villalovis was lying dead a few feet away in a pool of his own blood.

The knife, a common kitchen variety, that the defendant attacked Mr. Smith with was found by the police under the stove in the Smith apartment. At the trial Dr. Newman, M. D., testified that it could easily have been the murder weapon. It fit well into the wounds in the body of Jess Villalovis which caused his death and it had blood on it of the same type as that of the deceased. Mrs. Villalovis testified that the knife did not come from her kitchen and as far as she knew it did not belong to her husband. There were no distinguishable fingerprints on the knife.

From substantially this testimony the defendant was convicted. On this appeal he alleges four specifications of error. The first has to do with the court's instructions to the jury concerning the effect of intoxication in relation to the crime of murder.

The Montana law relating to the effect of intoxication on the guilt of a defendant is set forth in R.C.M.1947, § 94-119, subd. 1:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his being in said condition. But, whenever the actual existence of any particular purpose, motive, or intent, is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused man was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act."

This statute was given to the jury verbatim in the first paragraph of the court's instruction 33. The second paragraph of this instruction reads:

"If and when the proof shows that the defendant unlawfully killed a human being, and if the evidence also shows that at the time of the mortal assault the defendant was intoxicated, the jury is permitted and ought to consider such evidence of intoxication for the purpose of determining the purpose, motive, and intent with which the act was done."

The defendant assigns as error the giving of the following two instructions:

"No. 43. You are instructed that intoxication on the part of the accused in a prosecution for homicide should be taken into consideration not for the purpose of excusing or mitigating the killing, but for the purpose of determining whether the accused was capable of entertaining the purpose, intent, or malice, which is an indispensable ingredient in a charge of First Degree Murder."

"No. 44. You are instructed that if a person who is charged with Murder in the First Degree was intoxicated when the offense was committed to such an extent as to render him incapable of entertaining the purpose, intent or malice requisite for First Degree Murder, the crime is reduced to Second Degree Murder."

Defendant asserts that the giving of these instructions was prejudicial error because they amounted to a specific direction to the jury to find him guilty of second degree murder if they could not find him guilty of first degree murder because of his state of intoxication at the time of the killing, thus precluding a verdict of manslaughter.

Instructions 43 and 44 seem to be taken from the case of State v. Palen, 119 Mont. 600, at page 608, 178 P.2d 862, at page 866, wherein this court said:

"It is well settled that intoxication on the part of the accused in a prosecution for homicide should be taken into consideration, 'not for the purpose of excusing or mitigating the killing, but for the purpose of determining whether the accused was capable of entertaining the purpose, intent, or malice, which is an indispensable ingredient of certain grades of the offense.' 26 Am.Jur., Homicide, sec. 118, p. 235. And the clear weight of modern authority is to the effect that if a person who is charged with murder in the first degree was intoxicated when the offense was committed to such an extent as to render him incapable of entertaining the purpose, intent or malice requisite

for first degree murder, the crime is reduced to second degree murder. See 13 Rul.Cas.Law, sec. 18, p. 717 et seq.

"Deliberation and premeditation added to the unlawful killing with malice aforethought constitutes murder in the first degree. State v. Fisher, 23 Mont. 540, 59 P. 919; State v. Cates, 97 Mont. 173, 33 P.2d 578. And 'the purpose to kill may be formed the moment before it is executed as well as for an hour or a day, and still the act be premeditated.' Id., and see People v. Bellon, 180 Cal. 706, 182 P. 420.

"But as above noted, one who is intoxicated to the extent of being deprived of mental capacity to deliberate or premeditate cannot be guilty of murder in the first degree unless he formed the purpose to kill before becoming intoxicated."

The court halted their discussion at this point as in the Palen case the question of the distinction between murder and manslaughter, in relation to the possible effects of intoxication, was not there in issue. However, the words of the court in that case as embodied in Instructions 43 and 44 do not preclude a conviction of manslaughter if the possibility of such a conviction is placed before the jury.

The court instructed the jury as to what constitutes the crime of manslaughter and defined its elements to them. In addition to this the court gave the following instructions:

"No. 32. If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or

you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you can not find him guilty of murder of either the first or second degree."

"No. 53. The court instructs the jury that you cannot find the defendant guilty of murder in the first degree unless you find from the evidence that, at the time the fatal stabbing occurred, there was a specific intent existing in the mind of the defendant to take the life of the deceased, and that the stabbing was done by him with that purpose, and that such purpose was formed deliberately and premeditatedly, with malice as defined in these instructions, and that the mind of the defendant was fully conscious of the design to kill, and was not the immediate result of rashness, negligence or impetuous temper.

"If you find from all the evidence that there was no specific intent on the part of the defendant to kill Jesse Villalovis, and that no such intent can be reasonably inferred from all the evidence, then the killing would be murder in the second degree or manslaughter."

■ When the instructions are read as a whole, it is seen that the jury was instructed that if they found that the killing of Jess Villalovis was unlawfully done by the defendant with deliberation, premeditation and malice aforethought the defendant is guilty of murder in the first degree. If the jury believed that the killing was unlawfully done by the defendant with malice aforethought, but not deliberate and premeditated, or that defendant was incapable of premeditation and deliberation, because of his state of intoxication at the time of the killing, the crime is second degree murder. If they found that the killing was unlawfully done by the defendant without malice or he was so intoxicated at the time of the killing that he was incapable of harboring malice aforethought, the crime is manslaughter. This is a correct statement of the law. R.C.M.1947, §§ 94-119, 94-2501, 94-2503, 94-2507; State v. Laughlin, 105

Mont. 490, 73 P.2d 718; State v. Stevens, 104 Mont. 189, 65 P.2d 612.

The whole of the law on a subject cannot be given in one instruction. In determining the effect of given instructions, all instructions must be considered as a whole and if they fairly tender the case to the jury, the fact that one or more instructions, standing alone, is not as full or as accurate as it might have been is not reversible error. State v. Watson, 144 Mont. 576, 398 P.2d 949; State v. Stoddard, 147 Mont. 402, 412 P.2d 827; State v. Noble, 142 Mont. 284, 384 P.2d 504. The jury was aware of this by virtue of Instruction 9 which reads:

"No. 9. If in these instructions any rule, direction or idea be stated in varying ways, no emphasis thereon is intended by the Court, and none must be inferred by you. For that reason, you are not to single out any certain sentence, or any individual point or instruction, and ignore the others, but you are to consider all the instructions as a whole, and are to regard each in the light of all the others.

"The order in which the instructions are given has no significance as to their relative importance."

It appearing that the jury was adequately instructed as to the effect, if any, that intoxication had on the guilt of the defendant we find that the giving of instructions 43 and 44 was proper.

In his second specification of error the defendant seeks a new trial because the district judge refused his offered instructions relative to self-defense.

Under Montana law if a homicide is to be justified by self-defense there must be evidence that the party killing acted under the influence of a reasonable fear that someone was going to be murdered or seriously injured. R.C.M.1947, §§ 94-2513, 94-2514; State v. Jennings, 96 Mont. 80, 28 P.2d 448, 121 A.L.R. 375; State v. Fine, 90 Mont. 311, 2 P.2d 1016. In this case there is no evidence whatever that the defendant acted under a reasonable apprehension of death or great bodily

harm. The witnesses for the State gave no indication that the defendant did the killing in fear nor did the defendant himself claim that he acted under any fear of harm.

Instructions must have relation to the facts given in a particular case. State v. Evans, 60 Mont. 367, 199 P. 440. Although instructions may state a correct principle of law, if they are not based upon or in conformity with the issues or facts raised or supported by the evidence they ought not to be given. State v. Smith, 57 Mont. 563, 190 P. 107; State v. Mitten, 36 Mont. 376, 92 P. 969. In this case Judge McClernan was correct in refusing to instruct on self-defense.

Defendant claims that the prosecutor in his closing argument to the jury made improper remarks concerning the possibility of parole should the defendant be convicted. He states that these remarks caused the jury to return an improper verdict of guilty fixing punishment at ten years, "without parole."

Nowhere in the record is there any indication that such remarks were made. The closing arguments of counsel were not transcribed and transmitted to this court. When error is to be predicated on statements made in argument the complained of remarks should be made to appear in the record so that this court may know what actually took place, otherwise they cannot be assigned as error. State v. Stevens, 119 Mont. 169, 172 P.2d 299; State v. Totterdell, 135 Mont. 56, 336 P.2d 696.

In this case there could not have been any prejudice to the defendant even if such improper remarks were made. When the jury returned its first verdict imposing a time sentence "without parole," the trial court properly refused it as only the parole board, and not a jury or the court, has the authority to decide whether a prisoner shall be paroled. R.C.M.1947, § 94-9832; Goff v. State, 139 Mont. 641, 367 P.2d 557; State ex rel. Herman & Roy v. Powell, 139 Mont. 583, 367 P.2d 553. The jury then deliberated further and returned a verdict which left the sentence to the discretion of the court. As the

court imposed the sentence, there could be no prejudice to defendant resulting from any prosecutor's argument, concerning punishment.

 Lastly, defendant claims that the sentence of 40 years in the state prison was unduly harsh and unreasonable in this case. Concerning this issue this court has said: "* * * if the fixing of the degree of the offense as fixed finds support in the evidence and if the punishment is within the maximum limits fixed by law, then we cannot substitute our judgment for that of the trial judge. We are at liberty to interfere only in the event that there has been a clear abuse of discretion or a failure to follow the law." State v. Palen, 120 Mont. 434, 186 P.2d 223.

 The degree of the offense is supported by the evidence. The sentence imposed by the trial judge is authorized by R.C.M.1947, § 94-2505. There is no error on this point.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES HASWELL, ADAIR and CASTLES concur.