No. 80-424

IN THE SUPREME COURT OF THE STATE OF MONNTANA

1981

_____

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

LESLIE D. HOWARD,

Defendant and Appellant.

_____

Appeal from:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Robert L. Stephens, Jr. argued, Billings, Montana
Stephens and Cole, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Allen Chronister argued, Assistant Attorney General,
Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Corbin Howard argued, Deputy County Attorney, Billings,
Montana

_____

Submitted:  September 17, 1981

Decided:   NOV 2 5 1981

Filed:   NOV 2 5 1981

_____
Thomas J. Kearney
                                    Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Leslie Howard was charged in Yellowstone County with attempted homicide, aggravated kidnapping and sexual intercourse without consent. He was tried by a jury and on April 11, 1980, convicted of the lesser included offenses of aggravated assault and kidnapping. He was sentenced to concurrent terms of ten and twenty years at Montana State Prison and was designated a dangerous offender. The dangerous designation was removed by the Sentence Review Division. Howard appeals his conviction. We affirm.

The testimony of the victim and defendant was conflicting, and the verdict indicates that the jury believed portions of both stories. The victim, Debbra Aldridge, testified that she was working as a prostitute near the Western Bar in Billings, Montana, on the night of August 30, 1979. She met Howard, they agreed on her services, and she went with him in his car. Instead of stopping at Aldridge's house to consummate the agreement, Howard drove by it and stopped at a vacant lot. Howard informed her the act of intercourse would take place there, and over her protest dragged her out of the car. An altercation ensued in which Howard beat her, choked her, dragged her across the lot and attempted to rip off her clothing. At one point he was sitting on top of her and pulling her neck backwards with both hands. Aldridge testified, "I thought he was trying to break my back or my neck." He hit her on the side of the head and she lost consciousness. When she regained consciousness she was in the trunk of Howard's car. She had lost her purse and shoes in the struggle. The car stopped at South Bridge over the Yellowstone River. Howard pulled her out of the trunk, took off her dress, dragged her under the bridge and raped her. She managed to get away and ran toward the car, but Howard stopped her and started strangling her with her pantyhose. Aldridge finally broke free, dove into the river, and made her way to a

road where she found a ride to the hospital. She told the police about her shoes and purse, but they were unable to find them. Later, Aldridge and her husband found the vacant lot where her shoes and purse were located, and they notified the police.

Leslie Howard testified that he picked up a prostitute, Debbra Aldridge, near the Northern Hotel and drove her to her home where they had sexual intercourse. Howard offered to take her downtown so she could return to work. Aldridge then demanded payment but Howard refused, saying he was broke. Aldridge expressed concern that her pimp would be upset. Aldridge attacked him while he was driving and he stopped the car, went to the passenger door and opened it. She got out and they got into a fight. He admits hitting Aldridge but denies that she became unconscious. Howard testified that Aldridge had his glasses and he was attempting to get them back. He took off her dress and drove away, leaving her in the lot. He went back to her house to smooth things over and get his glasses and return her dress. Aldridge asked him to take her downtown. He drove her downtown but she told him to keep driving and eventually told him to pull over at the South Bridge. She got out of the car, ran down to the river, removed her dress and went swimming. Howard took her dress because Aldridge still had his glasses, and he left her there.

A search of Howard's residence revealed wet, sandy jeans and shoes. The victim's torn dress was found in the trunk of the car Howard had been driving. The police found the victim's shoes and purse and the defendant's glasses in the vacant lot after being notified by the victim of the lot's correct location. The victim identified Howard from a photo line-up and also in the courtroom.

Dr. Stephen Elliott was the attending emergency room physician who examined the victim on the night of the incident. He testified that she had strangulation marks on her neck, a

- 3 -

bluish tinge to her face and many petechiae, which are tiny purple spots caused by hemorrhaging of capillaries as a result of strangulation. She also had bruises and an injury to the eye. Several photographs were introduced into evidence which graphically portrayed her condition. Dr. Elliott testified he was "surprised to see a person with this much injury still alive," "[s]he looked like she should have been dead," and "if you get strangled badly you get [petechiae] like that." In addition, he gave the following testimony:

> "Q. Dr. Elliott, based upon your examination of the injuries that you saw on Debbie on the early morning of August 31, do you have an opinion as to what the force that was applied to her was designed to do?
>
> "MR. STEPHENS: Well, I object, Your Honor. That invades the province of the jury.
>
> "THE COURT: Overruled. You may answer.
>
> "A. Well, yeah, I have an opinion. I think that somebody tried to murder her. You know, I just can't believe that you can sustain that much trauma with any other intent."

On appeal Howard raises three issues: 1) Whether the District Court erred in allowing the doctor to testify as to the intent of the victim's assailant; 2) whether the District Court erred in failing to instruct the jury on the necessity of finding a specific intent; and 3) whether the District Court erred in refusing the defendant's proposed instructions on artificially placed or tampered evidence.

The objection made by defense counsel to the question calling for the doctor's opinion on intent was that it "invades the province of the jury." This objection is not adequate to justify exclusion of the testimony. It is merely another way of saying that the testimony embraces an ultimate issue to be decided by the jury. Rule 704 of the Montana Rules of Evidence provides:

> "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

- 4 -

This rule reflects long-established law in Montana. State v. Petko (1978), 177 Mont. 229, 581 P.2d 425; McGuire v. Nelson (1975), 167 Mont. 188, 536 P.2d 768; Rude v. Neal (1974), 165 Mont. 520, 530 P.2d 428; State v. Campbell (1965), 146 Mont. 251, 405 P.2d 978; State v. Shannon (1933), 95 Mont. 280, 26 P.2d 360; Kelley v. John R. Daily Co. (1919), 56 Mont. 63, 181 P. 326. Thus, the fact that the doctor's opinion on intent went to an ultimate issue is no basis for its exclusion.

Under Rule 704 the testimony must be "otherwise admissible." The admissibility of expert testimony is governed by Rule 702, Montana Rules of Evidence:

> "If scientific, technical, or other specialized
> knowledge will assist the trier of fact to
> understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or edu-
> cation may testify thereto in the form of an
> opinion or otherwise."

According to this rule, Dr. Elliott was clearly qualified to testify as to the nature and extent of the victim's injuries. Whether he could then extrapolate from this data and give an opinion is determined by whether the opinion would assist the trier of fact. Stated another way, the test is:

> " . . . whether the subject is one of such com-
> mon knowledge that men of ordinary education
> could reach a conclusion as intelligently as the
> witness, or whether the matter is sufficiently
> beyond common experience that the opinion of an
> expert would assist the trier of fact." State
> v. Campbell (1965), 146 Mont. 251, 258, 405 P.2d
> 978, 983.

Dr. Elliott inferred from the nature of the injuries that the person who inflicted them did so with an intent to murder. We find that under the circumstances of this case, the jury was as qualified as the doctor to draw an inference from the circumstantial evidence as to intent, and therefore the doctor's opinion on intent was inadmissible under Rule 702, Montana Rules of Evidence.

We further find that, for a number of reasons, the error was harmless under both the Montana and the federal constitu-

tional tests. Montana statutes provide that no cause of action shall be reversed by reason of any error committed by the trial court unless the record shows that the error was prejudicial, section 46-20-701, MCA; and that any error which does not affect substantial rights shall be disregarded, section 46-20-702, MCA. The federal constitutional test for harmless error is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction, Fahy v. Connecticut (1963), 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; or whether the reviewing court can declare a belief that the error was harmless beyond a reasonable doubt. Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

First, it is evident that the jury did not rely on the doctor's opinion because it returned a verdict of guilty of aggravated assault and kidnapping rather than guilty of attempted deliberate homicide. The crime of attempted deliberate homicide requires an intent or purpose to cause death; section 45-5-102, MCA; while neither aggravated assault nor kidnapping require an intent to cause death. Sections 45-5-202 and 45-5-302, MCA. See State v. Gone (1978), 179 Mont. 271, 587 P.2d 1291.

Second, the evidence is overwhelming that the defendant purposefully or knowingly inflicted bodily injury on the victim with a weapon. Dr. Elliott testified from his examination of the victim that she had been strangled with an instrument and that the strangulation had been severe. Dr. Elliott testified that, while the bruises, abrasions and petechiae were not in and of themselves "serious bodily injury" according to the statutory definition, section 45-2-101(53), MCA, they were "bodily injury" within the definition given to him from section 45-2-101(5), MCA. Debbra Aldridge testified that the defendant strangled her with her pantyhose and that when she was being strangled she thought her life was over. A pair of pantyhose may be considered a "weapon" under the definition of section 45-2-101(65), MCA, which

- 6 -

includes "any instrument, article, or substance which, regardless of its primary function, is readily capable of being used to produce death or serious bodily injury." A jury could have inferred from all the evidence that the defendant acted purposely, i.e. with the conscious object to engage in the conduct; or knowingly, i.e. with awareness of his conduct.

Finally, we note that the intent of the assailant was not a major issue in the trial. The major issue was the identity of the perpetrator. The defense theory was that the victim's pimp was the assailant.

We hold the admission of the doctor's opinion on intent was not prejudicial to the defendant, did not affect the substantial rights of the defendant, and was harmless beyond a reasonable doubt.

Defendant next argues the trial court erred in refusing to instruct the jury on the necessity of finding specific intent as an element of the crime. At common law, certain crimes were referred to as "specific intent crimes" because they required, in addition to a general criminal intent, a more particular or specific mental state. See Perkins on Criminal Law (2d.Ed. 1969), Chapter 7, Section 3. For example, common law burglary required an intentional or knowing breaking and entering into the dwelling of another with the specific purpose of committing a felony therein. The "general intent" of the defendant could be inferred from the doing of the act, while the "specific intent" was required to be proved by the prosecution. It is this distinction between general and specific intent which the defendant urges upon this Court, arguing that "purposely" and "knowingly" refer to general intent and that the State failed to prove the specific intent which is an element of aggravated assault.

The fatal flaw in defendant's argument is that aggravated assault is not a specific intent crime. Aggravated assault is defined by section 45-5-202(1), MCA, as follows:

- 7 -

> "A person commits the offense of aggravated assault if he purposely or knowingly causes:

> "a) serious bodily injury to another; [or]

> "b) bodily injury to another with a weapon . . ."

The legislature did not intend to require any other mental state in addition to "purposely or knowingly." If it had so intended, the legislature would have defined the specific intent in language similar to that used elsewhere in the criminal code. For example, see the definitions of solicitation, section 45-4-101, MCA ("with the purpose that an offense be committed"); burglary, section 45-6-204, MCA ("with the purpose to commit an offense therein"); and forgery, section 45-6-325, MCA ("with purpose to defraud"). The hierarchy of mental states used by the Montana Criminal Code is patterned after the Model Penal Code, and as we stated in State v. Sharbono (1977), 175 Mont. 373, 563 P.2d 61; and in State v. Klein (1976), 169 Mont. 350, 547 P.2d 75, was designed to alleviate the difficulties caused by the use of numerous terms describing culpability which were largely undefined. The Model Penal Code drafters abandoned the distinction of "general" and "specific" intent, commenting:

> " . . . we can see no virtue in preserving the concept of 'general intent' which has been an abiding source of ambiguity and of confusion in the penal law." Model Penal Code § 2.02. Comment (Tentative Draft No. 4, 1955, p. 128).

The court's instructions on "purposely and knowingly" were sufficient instructions on the intent necessary to convict on the crimes of aggravated assault and kidnapping.

Defendant's final argument is that the District Court erred in refusing his proposed instructions relating to the definition of tampered evidence and the use by the State of artificially placed evidence. The defense theory at trial was that the victim's pimp was her assailant and that they later planted evidence in an attempt to wrongly implicate Howard.

It is true that the police could not find the shoes, purse

and glasses at first. From her hospital bed the victim had given them an incorrect location of the vacant lot. Later she found the lot a block away, found the evidence therein and notified the police. At best, defense counsel created a suspicion that the evidence might have been planted. Debbra Aldridge testified that she had not planted the evidence. There was insufficient evidence to support a logical inference that the evidence was planted, and therefore insufficient evidence to support an instruction on that theory. State v. Kirkaldie (1978), 179 Mont. 283, 587 P.2d 1298; State v. Miner (1976), 169 Mont. 260, 546 P.2d 252.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

- 9 -