No. 84-462

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

THE STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

CRAIG STEVEN SMITH,

        Defendant and Appellant.

_____

APPEAL FROM:  The District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Moses Law Firm; Charles F. Moses and Jay F. Lansing
argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
John Paulson argued, Asst. Attorney General, Helena
Patrick L. Paul, County Attorney, Great Falls, Montana

_____

Submitted: October 22, 1985

Decided: March 14, 1986

Filed: MAR 14 1986

_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Defendant appeals the jury verdict convicting him of deliberate homicide in the Eighth Judicial District, Cascade County, on May 9, 1984.

We affirm.

This is the second time this Court has considered this matter. In November 1982 defendant Craig Steven Smith, an airman stationed at Malmstrom Air Force Base, was charged with the deliberate homicide of his fiancee Susan Galloway on or about October 23, 1982. The first trial ended in mistrial on January 18, 1984, at defense counsel's request, after the State questioned the victim's father as to what he had learned about defendant's sexual past. The basis for mistrial was a failure of the prosecution to give the Just notice of prior crimes introduction. See State v. Just (1979), 184 Mont. 262, 602 P.2d 957.

Following defense motions for dismissal on double jeopardy grounds and for change of venue, defendant filed a notice of appeal April 18, 1984. The State sought a writ of supervisory control on April 19, 1984. We affirmed the order denying the motion to dismiss after oral argument on the writ April 24, 1984. The second trial began April 25, 1984. A Cascade County jury found defendant guilty of deliberate homicide on May 9, 1984, and the court sentenced defendant/appellant to one hundred years on June 19, 1984. Appeal followed.

Appellant raised thirteen issues in his brief. However, we restate and decide the following issues as being dispositive of this appeal:

I. Whether he was twice put in jeopardy?

2

II. Whether the court erred in granting the State's motion to add the name of John Wehrenberg, a soil geologist, as an expert witness on April 23, 1984?

III. Whether the court erred in denying his motion for a mistrial?

IV. Whether the court erred in failing to strike the testimony regarding shoe prints?

V. Whether the court erred in denying his motion for a change of place of trial?

VI. Whether the court erred in admitting statements made to Arne Sand, polygraph examiner?

VII. Whether the court erred in improperly instructing the jury by failing to give the State's offered omnibus or alternatively failing to reread the preliminary instructions to the jury, by failing to give certain instructions, and by giving the instruction on the statutory definition of "knowingly"?

On October 22, 1982, appellant, hereafter referred to as defendant, appellant or Smith, and Susan Galloway ate dinner and played cards at her brother's home. The couple left at about midnight. The next morning at about 9:00 a.m., Smith called Susan's family and said she was not at the house where she was "house-sitting" when he called, and he was concerned. The family mobilized. Upon gathering together with Smith, the family noticed a jagged cut sewn up on his right hand. He told them and the police later that week that Susan had dropped him off at his apartment, that he went right to bed but woke up about 4:00 a.m., opened an orange juice can and cut himself on the can, and then went to Malmstrom AFB to have the cut treated.

The family conducted air, water and ground searches independently and in conjunction with law officers. On October 23, 1982, a dam worker spotted a reflection in some heavy brush down the cliff from an overlook to Rainbow Dam, about one mile from Malmstrom AFB in an area Susan's father

had once indicated to Smith was where cars were abandoned, unretrieved. Susan's body was discovered in the trunk of her car. She had been hit on the head with a bottle numerous times and then stabbed in the neck multiple times with the jagged edge of the then broken bottle. She had lost a lot of blood, only a small part of which was in the interior and the trunk. A convenience store clerk was to testify later that Smith and Susan had bought a bottle of pop at about midnight October 22, 1982.

A fellow airman had seen Smith at Malmstrom on October 22 at the time he said he was at his apartment in bed. Although he no longer lived in the Malmstrom dorms, Smith had come out of the bathroom wet, clutching a bundle of clothes. He was only wearing jogging shorts and a T-shirt. He then went to another friend's door and asked for a ride. He said he had been at the theater, gotten drunk, passed out, and awoke to find "the other guys" gone. He told his friend to say nothing because he did not want his fiancee to know. His friend gave him a ride home at about 2:30 a.m. October 23, 1982.

The sheriff's department scheduled an appointment with Smith for a polygraph examination on October 29, 1982. Smith came in voluntarily. He signed an "advisement of rights" form and consented to take the test. Sheriff's Deputy, Arne Sand, administered the test in three one-hour parcels. After the test, they went back to another office. Another deputy came in with a note stating that there was evidence linking five shoe prints at the scene with Smith's tennis shoes, "same size, same design." Sand showed the note to Smith and asked him if he knew what had been used to kill Susan and if he had killed her. Both times, Smith nodded affirmatively,

Sand later testified. At this time at the sheriff's request, Sand and Smith went with the sheriff to the county attorney's office where, after some discussion, the county attorney decided to arrest Smith. After jury selection in the first trial, the court held an evidentiary hearing on the issue of voluntariness of the admissions and found them voluntary and admissible.

The first trial ended in a mistrial. Defense counsel brought up to the victim's father the subject of a possible sexual relationship between the engaged couple and asked if they were "the type." Under cross-examination from the State, the father insisted his daughter was not the type but he had learned that Smith was. In fact, he had learned that Smith had relations with a thirteen-year-old girl at one time. Later it was disclosed in chambers that Smith was also thirteen, but the court still ruled that the State had introduced evidence of prior crimes--possible statutory rape--without the warning required from State v. Just and declared a mistrial. The State argued vociferously against a mistrial, asserting that it was character evidence to refute the pure character of defendant and not introduced as "a crime," and that defense had raised the issue of character.

The court on March 19, 1984, denied defense motions for change of venue and to dismiss the case on double jeopardy grounds. The court concluded that double jeopardy had not attached because there was no prosecutorial conduct intended to goad a defense request for mistrial; rather, the prosecution had acted in a good faith belief that it was refuting character evidence. The mistake of law as to how far the State could go did not amount to intentional misconduct sufficient for dismissal of the second trial on double

5

jeopardy grounds. The court further found that a change of venue motion was premature but could be renewed during jury voir dire if there was evidence of bias or prejudice on a jury panel.

On April 18, 1984, defendant filed a notice of appeal on the sole issue of double jeopardy. The State filed a petition for writ of supervisory control on April 19, 1984, asking this Court to suspend the rules for review of the court order and rule upon the petition by April 25, 1984, or very soon thereafter, or grant appropriate relief. On April 23, 1984, the State moved to add Professor John Wehrenberg, soil geologist, to the list of witnesses.

This Court on April 20, 1984, ordered the defendant to respond in writing by noon April 24, 1984, and heard oral argument that afternoon. In its order of April 24, 1984, this Court accepted jurisdiction. To expedite the matter upon good cause shown, this Court suspended the rules and immediately reviewed the court order on its merits. This Court affirmed the order denying dismissal of appeal on double jeopardy grounds. Defense motion for a continuance was denied without prejudice and jurisdiction was immediately remanded.

Trial began April 25, 1984, with jury selection. The State presented over forty witnesses. At the conclusion of the State's case, the defense moved for a mistrial on the grounds that witness Wehrenberg should not have been allowed to testify without the defense's opportunity to get its own expert. With the motion denied, the defense put on its case.

On the last day of trial, defendant took the stand and testified as to the inconsistencies of his story eighteen months earlier. He claimed he was actually acting at the

6

request of an OSI agent, a gray haired man in a blue suit, to help in a drug bust as a package courier. He testified that he had started this work in July 1982. As a security policeman, he testified he found it logical that he would be approached for such an assignment. He also testified that when he returned to his apartment, two men told him they were the people he had been delivering packages for and to come with them bringing a change of clothes and he cut his hand climbing a fence after they threw him in a ditch.

In rebuttal, the State called two OSI personnel, one a lieutenant colonel in charge of regional operations and another OSI agent in Great Falls. They testified that Smith was never a source of information and that he had no dealings in local OSI drug surveillance.

At the settlement of jury instructions, defense counsel had no objection to State's numbered 3, 6, 11, 12 and 21. Defense did object to State's number 13 as a peremptory Sandstrom instruction, the statutory definition of "knowingly." See Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The State objected to defendant's proposed number 2 as repetitive and defendant withdrew the instruction. Defense counsel did not object to the instruction on disregarding the testimony of Wehrenberg. After the court stated on the record that it would give instructions 1-26 and would not reread the preliminary instructions but would send them to the jury, defense counsel had no objection.

Not until after the court read the final instructions did the defense counsel ask for a hearing in chambers outside jury presence. Defense complained that the court should have read State's proposed #2 to make the omnibus complete. The

court denied the defense objection, saying that it had given most of the instructions and that to do as defense requested would result in repetition. The court noted that the parties had been given their opportunity to object before the reading of the final instructions.

We will consider additional procedural facts as they apply to particular issues raised in the following discussion.

Issue I. DOUBLE JEOPARDY.

Appellant first raises the issue of double jeopardy constitutional protection as a bar to retrial after a defense motion for mistrial, claiming that the State intentionally provoked defendant into moving for mistrial under the standard of Oregon v. Kennedy (1982), 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416. This Court already rejected this claim in its April 24, 1984, order following the hearing on the writ of supervisory control. State ex rel. Racicot v. District Court of the Eighth Judicial District, Montana Supreme Court No. 84-176. Therefore, appellant is precluded from relitigating his claim of double jeopardy under the doctrine of res judicata. See Meagher Co. Water District v. Walker (1976), 169 Mont. 358, 361, 547 P.2d 850, 852.

Issues II and III. ADDING NAME TO WITNESS LIST AND REFUSING TO GRANT A MISTRIAL.

Appellant contends that the court did not have jurisdiction to grant the State's motion to add Dr. John Wehrenberg's name to the witness list on April 23, 1984. If this Court finds jurisdiction, then appellant urges us to find error in that the State did not satisfy the "good cause"

8

requirement of § 46-15-301(1), MCA, (repealed 1985), and that this was so highly prejudicial as to merit a mistrial.

1. <u>Jurisdiction</u> <u>to</u> <u>add</u> <u>name</u>. On April 13, 1984, appellant filed a notice of appeal contesting the double jeopardy portion of the court order filed March 19, 1984, denying defense motions for change of venue and dismissal on double jeopardy grounds. The State filed its writ for supervisory control on April 19, 1984. This Court accepted jurisdiction on April 24, 1984.

The appeal of April 13, 1984, was premature, since an appeal may be taken by a defendant "only from a final judgment of conviction and orders after judgment which affect the substantial rights of the defendant." Section 46-20-104(1), MCA. See, e.g., State ex rel. La Flesch v. District Court (1974), 165 Mont. 302, 529 P.2d 1403. Therefore, the court still had jurisdiction. However, the question of jurisdiction on April 23, 1984, was irrelevant after the court considered the question on April 25, 1984, as to whether Dr. Wehrenberg should be allowed to testify, and again reviewed the issue on May 3, 1984, before he testified.

The court has the discretion to consider and endorse additional expert witnesses, even on the day of trial. State v. Liddell (Mont. 1984), 685 P.2d 918, 41 St.Rep. 1293; State v. McKenzie (Mont. 1980), 608 P.2d 428, 37 St.Rep. 325. Because the court did so after the Supreme Court order of April 24, 1984, the issue of jurisdiction when the motion was filed on April 23, 1984, had become moot. The motion was effectively renewed in court.

2. <u>"Good"</u> <u>cause</u> <u>to</u> <u>add</u> <u>witness</u>. Appellant next claims that the court abused its discretion in endorsing Dr. Wehrenberg without notice and opportunity to be heard on

April 23, 1984, and without good cause shown as to the delay in producing the witness. This Court has not required notice and hearing for such motions. See, e.g., State v. Rozzell (1971), 157 Mont. 443, 486 P.2d 877. Furthermore, appellant had ample opportunity to be heard at the commencement of trial. Finally, the court granted his motion to strike the testimony and instructed the jury to disregard it.

Appellant contends that the State failed to establish the good cause requirement of § 46-15-301(1), MCA, (repealed 1985) (in effect at the time of trial): "The prosecution may, anytime after arraignment, add to the list the names of any additional witnesses upon a showing of good cause." Claiming that the delay was due to a continued oversight on the part of the State to add the witness, appellant asserts that the good cause requirement under State v. Haag (1980), 176 Mont. 395, 401, 578 P.2d 740, 744, has not been met. However, our opinion in Haag clarified by stating: "Lack of knowledge by the State as to the names of witnesses or potential relevancy of witnesses' testimony provides a legal excuse for not listing the witnesses' names on the information." Haag, 578 P.2d at 744.

The facts of this case are distinguished from Haag in that the State claimed an initial lack of knowledge as to what a soil scientist could testify. Once the State requested the information and received the report and his testimony was deemed relevant, Dr. Wehrenberg became a "known witness." The State immediately moved to add his name to the witness list. There was no continued failure or oversight to do so once the State realized the testimony was relevant.

Appellant further contends that to meet the "good cause" threshold requirement, the State must have established

10

a "substantial reason," i.e., one that afforded a legal excuse. State v. Klein (1976), 169 Mont. 350, 547 P.2d 75, 77. The State has its legal excuse in "lack of knowledge." See Haag, supra. Then the court should determine whether there was prejudice based upon surprise, and, if so, whether the prejudice could be overcome by the grant of a continuance.

The record indicates that the court heard the argument from defense counsel on April 25, 1984, stating that the prejudice he was relying upon was that he should have equal opportunity to get his own expert and could not do it over the weekend. Counsel said that he could get an expert recommended by a physicist in Bozeman. The court determined that the trial would last a long time and counsel would have adequate time. The State offered to make every effort to assist counsel and proposed willingness to forego the testimony rather than continue the trial, if counsel could not get an adequate examination. The court then recommended that the State present Wehrenberg's testimony late in trial so as not to prejudice the defendant. Finally, the court denied the motion for continuance without prejudice, in the event that the State should want to present the testimony and defense should find itself unable to find an expert to rebut the testimony.

On May 3, 1984, in proceedings in chambers, defense counsel stated that he had immediately made contacts to find an expert. One was available in Bozeman and indicated he could do the soil testing possibly within forty-eight hours of receipt. For an unexplained reason, counsel was not satisfied with this expert's credentials and searched further, finding others in-state who were unable to do it and

who referred him out-of-state. The record indicates that the State made every effort to find experts and found two in Bozeman that Dr. Wehrenberg said were qualified to testify. The facilities and the soil samples at the State Laboratory were available to anybody. The State was willing to transport the samples any place. The court concluded that defense had not been prejudiced by lack of time to secure its own witness and ruled to permit the introduction of the testimony.

The State called Dr. Wehrenberg following witness Bill Newhouse's testimony on footprints and defendant's shoes. From qualifying as an expert for purposes of testimony to conclusion of his testimony, Wehrenberg's testimony on record consisted of fifty-five pages of transcript out of approximately 2000 pages of testimony. After five more witnesses testified, defense counsel made a motion to strike Dr. Wehrenberg's testimony for lack of notice and opportunity to secure a witness, based upon testimony under cross-examination that it took nineteen days to conduct testing of soil samples. At this time the court granted the motion and gave a cautionary instruction to the jury.

Not until the State concluded its case two witnesses later (and seven after Wehrenberg's testimony) did defense counsel move for a mistrial on the ground that Wehrenberg's testimony could not be cured by striking and giving the instruction and that the testimony would be so highly prejudicial as to prevent a fair trial. The court denied the motion for a mistrial. The rulings of the District Court with relation to testimony of witness Wehrenberg, if erroneous, amount to harmless error. Other evidence submitted to

the jury clearly established the guilt of the defendant, and the jury so found.

3. **Refusal to grant a mistrial.** Defense counsel demonstrated no prejudice to defendant from the testimony, nor did he demonstrate that the jury failed to heed the cautionary instruction to defendant's prejudice. The court further showed no abuse of discretion in that initially there appeared adequate time to overcome any surprise in adding the witness's name, without a continuance, and not until cross-examination of the witness did defense make a case that he did not have adequate time to get a prepared and qualified expert. At that time the court properly exercised its discretion in granting the motion to strike the testimony. The striking of erroneously admitted evidence and admonishing the jury to disregard it serves to cure error. State v. Bradford (1978), 175 Mont. 545, 551, 575 P.2d 83.

On appeal we are asked to determine whether there was abuse of discretion in refusing to grant a mistrial. The District Court is in the position to observe the event and the reaction of jurors, unlike an appellate court, and there must be necessity to order a mistrial. State v. Close (Mont. 1981), 623 P.2d 940, 946, 38 St.Rep. 177. Here we find no abuse of discretion. The court granted defendant's motion to strike the testimony, which would have been incomprehensible to a jury without a cautionary instruction. The court was in the best position to determine if the brief testimony of Wehrenberg adversely affected the proceedings and properly found no prejudice once the testimony was stricken.

Issue IV. TESTIMONY OF FIREARM AND TOOL MARK EXPERT.

Appellant contends that the Court's failure to strike the testimony of witness William Newhouse was error because the testimony (1) was not relevant under Rule 401, Mont.R.Evid., and (2) lacked a proper foundation in that an expert was not required where ordinary persons could reach their own conclusion without expert assistance.

1. Relevance. Newhouse was qualified by the District Court, without objection, as an expert in firearm and tool mark identification, including shoe print identification. His testimony involved a comparison of plaster casts of shoe prints from the scene with defendant's shoes. Although he could not positively identify defendant's shoes as making the shoe prints, he did testify that the impressions were exactly like defendant's shoes based upon four identifying characteristics. Appellant contends that Newhouse testified to "possibilities not probabilities" and "similarities not identities." Relevance under Rule 401, Mont.R.Evid., means having a tendency to make a fact more probable or less probable than it would have been without the evidence, not more possible or less possible, he claims. Yet, counsel did not object to Newhouse's conclusions at the trial as inadmissible for lack of relevance, only later moving to strike the testimony.

Appellant has urged a novel interpretation of relevance, but we are not persuaded. Evidence is relevant if it naturally and logically tends to establish a fact in issue. See McGuinn v. State (1978), 177 Mont. 215, 221, 581 P.2d 417. Here, the fact in issue was the presence of defendant at the crime scene. Newhouse's testimony as to the similarities between the shoes and the shoe prints at the scene

14

tended to make more or less probable this fact in issue. We accepted expert testimony as to similarity of a defendant's boots to footprints at a crime scene as relevant without question as part of the cumulative circumstantial evidence in State v. Briner (1977), 173 Mont. 185, 567 P.2d 35.

Because Newhouse could not identify the prints positively "to a degree of scientific certainty," appellant urges this Court to find the testimony inadmissible. We find no error in the court's refusal to strike the testimony. We find the reasoning persuasive in State v. Kelly (Ariz. 1974), 526 P.2d 720, cert. denied, 420 U.S. 935: expert testimony linking footprints at the scene of a crime to shoes belonging to defendant, absent a positive identification, is admissible, and the imprecision of the expert opinion goes to the weight of evidence for the jury, not admissibility of the evidence.

2. Foundation for expert opinion. Appellant claims that Newhouse's testimony should have been stricken because it did not satisfy the requirements for expert testimony under Rule 702, Mont.R.Evid., i.e., the subject was of common knowledge and persons of ordinary education could reach a conclusion from their own common experience as intelligently as the expert witness. State v. Howard (1981), 195 Mont. 400, 404, 637 P.2d 15, 17; State v. Campbell (1965), 146 Mont. 251, 258, 405 P.2d 978, 983. We disagree that expert testimony was unnecessary to "assist the trier of fact to understand the evidence or to determine a fact in issue" (Rule 702, Mont.R.Evid.) in the matter of shoe prints. Newhouse had specialized knowledge pertinent to identifying characteristics of shoe prints, knowledge which was not within the common knowledge of men of ordinary education.

15

The foundational requirement for the necessity for expert testimony was met.

Issue V.   CHANGE OF VENUE

Following a hearing on March 13, 1984, the District Court issued its order finding that defendant's pretrial motion for change of venue was premature but could be renewed during voir dire if prejudice or bias was evident. Appellant moved to change the place of trial on April 26, 1984, after jury selection. The court denied the motion, noting that it had granted every defense challenge for cause. Appellant claims that the court erred in denying the motions for change of venue in that the dissemination of the inadmissible testimony which caused the mistrial January 16, 1984, led to a reasonable apprehension that the accused could not get a fair trial.

Denial of a motion for change of venue is not reversible error in the absence of an abuse of discretion by the trial court. State v. Paisley (Mont. 1983), 663 P.2d 322, 40 St.Rep. 763; State v. Kirkaldie (1979), 179 Mont. 283, 587 P.2d 1298. The record indicates no abuse of discretion. Although appellant claims denial of fair trial because nearly all of the impaneled jury had heard of the case, he fails to demonstrate "such prejudice that a fair trial cannot be had in such county." Section 46-13-203(1), MCA. Appellant did not demonstrate at pretrial (nor does he establish on appeal) that a prejudicial atmosphere existed within the venue which created a reasonable apprehension that he could not get a fair trial. See State v. Ritchson (Mont. 1982), 647 P.2d 830, 39 St.Rep. 1201.

16

Knowledge on the part of jurors is not sufficient and cannot be equated with prejudice. To be granted a change of venue, a defendant must prove that the news reports were inflammatory and that they actually inflamed the prejudice of the community. Ritchson, 647 P.2d at 832. The voir dire failed to raise such indications of prejudice. Of forty-one potential jurors, all but one had read or heard of the case. Yet only ten could recall any specifics and only three of these had formed a preliminary feeling. Following in-chambers questioning, these three were excused. The court granted all of the defense counsel's challenges for cause. Defendant passed the unchallenged jurors for cause with respect to the issue of pretrial publicity and later passed all prospective jurors for cause at the conclusion of his voir dire. He did not challenge the jury panel as a whole or renew his motion for change of venue until the next day.

We can find no prejudice. The court did not abuse its discretion in denying the motion for change of venue.


Issue VI. STATEMENTS MADE TO POLYGRAPH EXAMINER.

Appellant contends that the court erred in admitting the testimony of Arne Sand, the polygraph examiner, concerning admissions made following a polygraph examination. There are two prongs to appellant's claim: (1) the admissions were part of a lie detector test process and lie detector test results are inadmissible; and (2) the admissions were not voluntary.

1. Lie detector tests and statements afterward. Appellant states the rule in Montana in asserting that the results of polygraph examinations are not admissible as evidence in a criminal trial. State v. Bashor (Mont. 1980),

17

614 P.2d 470, 479, 37 St.Rep. 1098; State v. Beachman (Mont. 1980), 616 P.2d 337, 37 St.Rep. 1558. There is no authority cited for the claim that any statements made during the post-interview are also inadmissible. Furthermore, appellant is mistaken in equating test results with statements made during and after the questioning. The results of a polygraph examination involve the test-giver's evaluation of responses and therefore invade the province of the jury when used merely to support the credibility of the witness. See Bashor v. Risley (9th Cir. 1982), 730 F.2d 1228, 1238. Statements involve direct responses to questioning and not the evaluation of the credibility in responding.

The thrust of appellant's challenge is that the "post-interview" is so integrated with the test that any evidence is inadmissible. In examining the record we find appellant's claim stretches the alleged immunity of testimony occurring in the polygraph examination.

The period of time in which the defendant affirmed to Sand that he killed Susan was not part of or related to the questioning under the polygraph examination procedures. Sand had disconnected the test and they went back to the office. While there, Sand received "other unconnected information" not used in the examination, i.e., a note from an investigating officer. This note indicated a match of Smith's shoes with five different footprints found at the scene. Sand testified that he then asked Smith if he knew what had killed Susan and if he had killed her. Smith's response was an affirmative nod both times, Sand testified.

Even if the appellant had challenged any admissions during the test (which he did not do), we do not find his argument persuasive that these responses had anything to do

18

with the test. Nor do we find that Sand's testimony related "test results"--that is, an evaluation of the credibility of the witness. Sand merely related the affirmations he had perceived from the accused. It was the jury's province to evaluate the testimony.

Statements, when they are admissions of the accused and when testimony does not involve an evaluation of the truth of his response, may be admitted into evidence, provided that the accused consented to the test and there was no coercion. See, 29 Am.Jur.2d Evidence, § 551. The court here properly granted the defendant's motion to keep out all evidence that there was a polygraph examination. The State and its witness carefully avoided any allusion and treated the examination like any other interview. In fact, defense counsel successfully brought out the exculpatory responses made during that test, without the State's revealing the specific nature of the questioning. The defense, thus, was allowed to use his responses during the examination as exculpatory statements. Appellant, however, only challenges the admitting of those responses made afterward to questions unrelated to the exam procedure. The issue is not whether statements made in the period surrounding the exam are admissible, but rather whether incriminating admissions should be admitted after a waiver of rights and consent to take the test.

This Court has not dealt with the issue of admissibility of an otherwise voluntary confession following a polygraph examination, even though the results of the exam itself would not have been admissible. Appellant has cited no authority for his contention that if the lie detector test results cannot be admitted into evidence, then everything surrounding the process is inadmissible. The State, however, cites from

19

other jurisdictions in which the confession was admissible, even though the results would not have been. See State v. Tucker (Ariz. 1978), 574 P.2d 1295, cert. denied (1978), 439 U.S. 846, 99 S.Ct. 144, 58 L.Ed.2d 147; State v. Clifton (Or. 1975), 531 P.2d 256. We find that the admissions were admissible into evidence.

2. <u>Voluntariness of confession</u>. The District Court held a hearing on the voluntariness of the admissions after the jury was selected and before the first trial began. The court made a specific finding that the admissions were voluntary as well as admissible. There is substantial evidence in the record to support the finding: Smith signed a rights and waiver form to take the test, he had been fully advised of his constitutional rights and he knowingly waived these rights.

Appellant makes no specific charges of promises, threats, duress or coercion, nor does he demonstrate unfair or unreasonable examination procedures. He makes a bare-bones allegation that the test took three hours, after which Sergeant Sand was handed the note. Appellant also claims that he was induced to sign a waiver to take a polygraph test, expecting to get exculpatory evidence in exchange for telling the truth. The waiver failed because he was not told that he could not use test results, appellant contends, and therefore any statements were not voluntary. As discussed previously, appellant did use the statements if not the test results as to credibility. This is not sufficient to override the court's finding in the voluntariness hearing.

Voluntariness of a confession is a factual question addressed to the discretion of the trial court. We will not overrule its determination if it is supported by substantial

credible evidence.  State v. Allies (Mont. 1980), 621 P.2d 1080, 1087, 37 St.Rep. 2089, 2097-2098.  Whether a confession is voluntary depends upon the "totality of the circumstances" of the particular case.  State v. Mercer (Mont. 1981), 625 P.2d 44, 47, 38 St.Rep. 312, 315.  We find that the court properly determined based on substantial credible evidence that the statements were voluntary under these circumstances.

Issue VII.  JURY INSTRUCTIONS

Appellant claims that the jury was improperly instructed.  He argues that the trial court should have reread the preliminary instructions which the court gave before the introduction of evidence or, alternatively, should have given the omnibus instruction offered by the State.  Next, he argues that the court erred in failing to give certain instructions offered by either the State or the defendant.  Finally, he claims that the court erred in giving the instruction on "knowingly."

1. Failure to give omnibus or to reread preliminary instructions.  The court did not reread the preliminary instructions.  The court chose not to give the omnibus as a preface to final instructions read at the close of the trial because some of the matters were repetitive of preliminary instructions.  Instead, the court chose to send the preliminary instructions in with the final instructions to the jury.

Appellant contends that these instructions not read in the omnibus or reread from the preliminaries denied the jury the usual cautionary and limiting instructions .  We note that appellant did not object at the time the court informed the parties that it would not reread the preliminaries and in fact only raised the objections after the jury was charged.

21

Appellant has not shown any prejudice affecting appellant's substantial rights resulting from the District Court's decision not to reread the preliminary instructions. As such there is no reversible error. Section 46-20-702, MCA.

2. Court's refusal to give proposed instructions. Next, appellant argues that the court erred in failing to give defendant's proposed instruction numbers 6, 15, and 21, and State's proposed instruction number 6. These covered reasonable doubt arising from lack of evidence, construction of evidence subject to two interpretations, weight of testimony of law officers and other state officials and a supplementary instruction on circumstantial evidence. The State did not object to these instructions, yet they were denied by the court. Defendant did not object to the court's denial at settlement, only raising his desire to have the court read these after the jury had been charged.

It is within the prerogative of the trial court to determine which instructions are necessary. State v. Meidinger (1972), 160 Mont. 310, 322, 502 P.2d 58, 65. Where specification of error concerns instructions which were not objected to at the time the instructions were settled, they cannot be challenged on appeal. Meidinger, 502 P.2d at 65.

We find no error where the jury was on the whole adequately instructed, and the appellant raised no issue of plain error in the substance. "Reasonable doubt" was covered without objection in the preliminary instructions, and it was not error to refuse a supplementary instruction. Defendant cited no authority to the District Court for number 15 on circumstantial evidence susceptible to two interpretations. There was no error to refuse it when the court in its discretion determined it was only proper in a case resting

22

entirely on circumstantial evidence. The cautionary instruction on testimony of law officers, defendant's proposed number 21, invades the province of the jury to determine credibility of witnesses and there is no error in refusing to give such an instruction. See State v. Mott (1925), 72 Mont. 306, 233 P. 602. There was no error to refuse the State's offered instruction on two kinds of evidence, direct and circumstantial, in that this was adequately covered in the preliminary instructions.

3. Instruction on "knowingly." Finally, appellant contends that the court erred in giving the State's proposed instruction number 13 on the statutory definition of "knowingly." Section 45-2-101(33), MCA. We find no error where "knowingly" is an element of the offense of deliberate homicide. Section 45-5-102, MCA. Furthermore, defendant offered no instruction on this element of the offense nor did he cite any authority to support his position. Appellant acknowledges that this Court has upheld the definition against such constitutional and other grounds. State v. Coleman (1979), 185 Mont. 299, 605 P.2d 1000. This Court is not obligated to refute a bald assertion, absent specific argument or authority and void of definable prejudice. McGuinn v. State (1978), 177 Mont. 215, 220, 581 P.2d 417, 420.

Appellant has attempted to demonstrate cumulative error in his attack upon the jury instructions. Yet he has demonstrated no prejudice to the defendant nor has he shown that the instructions were inadequate on the whole.

This Court reviews jury instructions as a whole and, if they fairly cover the issues to tender the case to the jury, they are sufficient. State v. Brooks (1967), 150 Mont. 399,

436 P.2d 91. We find that the jury instructions as a whole were sufficient.

The verdict of the jury and sentence of the District Court are affirmed.

_____
Chief Justice

We concur:

_____
_____
_____
_____
_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I dissent.

I.

Jurists have no difficulty in accepting the theory of double jeopardy. The constitutional goal that a person should not be put at risk for his life, property, or freedom more than once for the same alleged crime is to prevent continued prosecutions by the State until it finally gets the person convicted. As a concept, that is quite acceptable. In practice however, in a double jeopardy situation, jurists face a difficult problem. If double jeopardy has in fact occurred the person, though he may be guilty, walks free. A double jeopardy issue such as we find here places an appellate court between the hammer and the anvil, to temper the steel of the law.

It is my judgment that the defendant has been subjected to double jeopardy.

The first trial of Smith was a jury trial. The jury was impaneled and sworn and witnesses were sworn and testified. Jeopardy therefore attached. Crist v. Bretz (1978), 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24. What happened in the first trial to bring about the motion for mistrial is not related in the majority opinion and I therefore set it forth here.

Counsel for Smith in cross examining Edwin Galloway, the father of the deceased victim, elicited the following testimony:

Q. Were they sleeping together? A. No, sir.

Q. Are you satisfied of that? A. Yes, sir.

Q. And that they were both just not the type because of their religious belief to be sleeping

together, right? A. I don't know about him, but I know about her.

Q. There is nothing you knew about him that would cause you to disbelieve that he had the same and equal feelings about the situation? A. Not at that time. Since then I do have.

Q. Well, it is just an opinion of yours then, isn't it? A. Yes, sir.

In redirect examination the prosecution examined as follows:

Q. Mr. Moses was talking to you about your daughter and the Defendant. I'm not sure I was able to catch all of it. Something about they weren't the type. What was your response to that question? A. I believe he was talking about sleeping together, and mine was I knew what Sue was but I did not know what Smith was doing or his intentions.

Q. At the time, and reflecting back now, Ed, at the time you were fairly confident he wasn't the type, either, weren't you? A. Yes, sir.

Q. And didn't you say that since then you have changed your opinion? A. Yes, sir.. . .

(Author's note: If the prosecution had stopped here, there could be no quarrel. Instead, he pressed on.)

Q. (By Mr. Racicot). What was the information you received, Ed? A. That he was corresponding and had another girl that he was going to marry.

Q. Did you receive any information concerning his previous sexual activity? A. Yes, I did.

Q. And what was that information? A. That he went with a girl here in town and had sex with her before he had went with Susan.

(Author's note: Now the prosecutor moved in for the kill.)

Q. Did you receive any information about some of the girl friends he had back in Virginia? A. Yes, sir.

Q. And what did that information entail? A. That he had impregnated a girl, and she was 13, and the girl aborted the baby.

Q. So that was the information that changed your opinion? A. Yes. That and other gossip.

Following that examination by the prosecutor, the defendant moved the District Court for a mistrial and the District Court was forced to agree. Accordingly the first jury was discharged and the first trial ended.

Defendant's counsel thereafter moved to dismiss the prosecution entirely on the ground that since jeopardy had attached to the first instance, further prosecution by a second trial would constitute double jeopardy. The District Court denied the motion to dismiss, holding:

> The court finds that the prosecutor was not guilty of goading or misconduct, that the prosecutor acted in good faith under the mistaken belief that since defense counsel sought to introduce evidence of good character that the State was justified in disproving the same, particularly as to the defendant's sexual past. This, in the court's opinion, was a mistake of law on the part of the prosecution as to how far the State could go in introducing evidence of bad character and particularly the evidence that the defendant had impregnated a 13 year old girl and that she had an abortion.

The court concluded that the prejudicial effect of the evidence far outweighed its probative value as evidence of bad character.

The further argument of counsel for Smith on the motion to dismiss was that the State had failed to give any notice of evidence of prior crimes as required in State v. Just (1979), 184 Mont. 262, 602 P.2d 957. The District Court referred to our decision in State v. Just but made no decision respecting its applicability. State v. Just was intended to set up guide rules for district courts in criminal actions where it was the intention of the State to introduce evidence of other crimes or wrongs. Under Section 404 Montana Rules of Evidence, evidence of other crimes,

wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. In this case the acts which the prosecutor elicited from witness Galloway had no tendency to prove a trait of character to which he conformed under the charges against him.

When the District Court denied Smith's motion to dismiss on the grounds of double jeopardy (he had also asked for a change of venue) Smith appealed the denial of dismissal to this Court, which of course, he had a right to do. A defendant is not required to undergo the second trial before his appeal of denial of a double jeopardy issue is heard.

I must now set out a timetable for the reader to understand what happened next. On January 18, 1984, the District Court had declared the mistrial in the first case. On January 27, 1984, Smith filed a motion to dismiss entirely on the grounds of double jeopardy. On February 2, 1984, the retrial of the cause was set by the District Court for April 25, 1984. On March 19, 1984, the District Court entered its order denying the motion to dismiss on double jeopardy grounds. On April 18, 1984, the defendant perfectly within the time afforded by the rules, filed his notice of appeal from the denial of his double jeopardy claim.

On April 19, 1984, the State on the relation of the special prosecutor filed a petition in cause no. 84-176 in this Court for a writ of supervisory control requesting this Court to suspend our rules for appellate review of the District Court's decision, to vacate the notice of appeal, to take immediate jurisdiction and to decide the issue of double jeopardy. On April 20, 1984, this Court issued its order directing defendant to prepare, serve and file a written response to the prosecutor's petition by noon of April 24,

1984. Oral argument on the petition was set and had on April 24, 1984 at 1:30 p.m. This Court in the same afternoon after the hearing made and entered its order affirming the denial of dismissal on the ground of double jeopardy and ordering the trial to proceed the next day as previously set on April 25, 1984.

Thus was this Court stampeded into deciding the vital issue of double jeopardy. Our order for the issuance of writ of supervisory control in cause no. 84-176 is unpublished. Three of the then justices, Chief Justice Frank A. Haswell, John Conway Harrison, and L. C. Gulbrandson signed the plurality opinion. Justice Frank B. Morrison concurred specially that double jeopardy did not attach but he hoped that the trial court would consider a motion for continuance of the retrial. Justices John C. Sheehy and Daniel J. Shea dissented to the precipitous action of the plurality and Justice Fred J. Weber dissented on the ground that the circumstances of the case did not justify the immediate action being taken by the court "majority."

The defendant Smith was thus deprived of a measured approach to a decision on his appeal. Now, the fractured decision in the supervisory control case, issued a bare four days after the original pleading was filed, is used by the majority to bar further consideration of the double jeopardy issue on the grounds of res judicata! "O, judgment has flown to brutish beasts and men have lost their reason."

By resorting to res judicata as its ratio decidendi, the majority do not have to explain whether they will adhere to the rule of the Supreme Court of the United States in Oregon v. Kennedy (1982), 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416, 424, or whether they would adopt the expanded rule

undertaken by Oregon itself in State v. Kennedy (Or. 1983),
666 P.2d 1316.

The effect of the holding of the United States Supreme
Court in Oregon v. Kennedy was that double jeopardy will not
be found, even though the defendant made a successful motion
for mistrial, if the conduct of the state which brought about
the mistrial was not intended by the state to provoke the
defendant into moving for a mistrial.

The Supreme Court of Oregon determined that the United
States Supreme Court was too narrow in its interpretation of
the effect of the prosecutorial conduct, and stated that a
retrial would be barred if the conduct of the state was
intended to goad the defendant moving for mistrial or the
prosecutor either intended a mistrial or was indifferent to
the resulting mistrial.    666 P.2d at 1325.    The Oregon
Supreme Court said:

> A test limited to intentional provocation of
> mistrials, however, has two shortcomings besides
> the question of proof.  First, the Supreme Court's
> analysis focused on prosecutorial misconduct, as in
> this case.   The Court adopted that test in part
> because, within the limits of professional ethics
> and the state's other overriding values,
> prosecutors are expected to strive for convictions,
> and "overreaching" could be asserted of every
> prejudicial error that may require a retrial.
>
> . . .
>
> Second, a finding that a prosecutor initially
> pursued a course of prejudicial misconduct for the
> purpose of forcing a mistrial is a grave matter.
> Such behavior is a contempt of court.    ORS
> 33.010(c), (d).    It also is a violation of
> professional standards that can lead to disbarment
> or other discipline, and perhaps of federal civil
> rights statutes.  See DR 1-102(A)(5), 7-102(A)(1);
> 18 U.S.C. § 242.  A judge prepared to make such a
> finding properly would not only declare a mistrial
> without possibility of reprosecution but also
> report the episode to the Oregon State Bar, Code of
> Judicial Conduct Canon 3(B)(3).   But we do not
> think that impermissible double jeopardy for the
> defendant is limited to the few situations in which
> a judge is sufficiently convinced of a prosecutor's

> improper intentions to invoke those penalties. That places too heavy a burden on the inference that a defendant must ask a judge to draw from the objective conduct and circumstances. To repeat, punishment of the errant official is not the object of the guarantee against placing the defendant again in jeopardy for the same offense. Whether or not the official's error rises to that level of culpability, for purposes of the guarantee we think it suffices that he has consciously chosen to engage in prejudicial misconduct, whatever the motive.
>
> We therefore conclude that a retrial is barred by article I, section 12, of the Oregon Constitution when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal. When this occurs, it is clear that the burden of a second trial is not attributable to the defendant's preference for a new trial over completing the trial infected by an error. Rather, it results from the state's readiness, though perhaps not calculated intent, to force the defendant to such a choice.

666 P.2d 1325-26.

The State of Arizona has also broadened the U.S. Supreme Court decision in Oregon v. Kennedy, holding in Pool v. Superior Court of the State of Arizona (Ariz. 1984), 677 P.2d 261, that if the mistrial is granted because of the improper conduct of the prosecutor and the conduct taken as a whole amounts to intentional conduct or which is pursued for any improper reason with indifference to the significant danger of mistrial, that double jeopardy attaches.

Counsel for Smith in this case contends that even if we adopt the standard provided by the U.S. Supreme Court in Oregon v. Kennedy, the intent of the prosecutor is the fulcrum of decision; that we should apply the same tests in determining that intent as is applied under our criminal statutes to a criminal defendant. Thus Smith's counsel contends that the prosecutor acted knowingly if he was aware of his conduct or that the circumstances existed, and that he

acted knowingly with respect to the result of his conduct if he was aware that it was highly probable that such a result would be caused by his conduct. Further, the prosecutor, Smith's counsel contends, acted purposely with respect to the resulting mistrial, if it was his conscious object to engage in the conduct or to cause the result. Section 45-2-101, MCA. We have approved of those tests before as to the meaning of "knowingly" and "purposely," State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732. There seems little reason why the same test should not apply to the conduct of the prosecutor in bringing about a defense motion for mistrial.

It is my opinion that in cases such as presented here on the issue of double jeopardy, that we should adopt the standards of conduct taken and approved by the supreme courts of Oregon and Arizona and apply those standards under Art. II, § 25, 1972 Mont. Const. as state policy. Such standards would require further determination by a fact finder as to whether the prosecutor here acted purposely and knowingly in eliciting the improper testimony. I have expressed my thoughts on double jeopardy at length in this dissent because the U.S. Supreme Court in Oregon v. Kennedy, supra, found a safeguard to defendants in double jeopardy questions in the availability of a review in the federal courts system on habeas corpus. There has not been an adequate disposition of the double jeopardy question in this instance either under our issuance of a writ of supervisory control or by the determination of this appeal. In my opinion the State was negligently indifferent to the result of its conduct in the first trial and I would dismiss on grounds of double jeopardy.

There are additional grounds on which I would reverse the results in this case. Each is an example of overreaching by the State. Thus I would reverse for errors in adding Jack Wehrenberg as a witness on April 23, 1984, for failure to strike the testimony of Bill Newhouse, for failure to grant a change of venue, for admitting the statements attributed to Smith by Arne Sand but especially for instructional error which I will now discuss.

The District Court failed to give instructions vital to the defense when the cause was submitted to the jury, the court taking the position that the jury had been instructed in the preliminary instructions, and the jury would take the written instructions with them to the jury room.

The issue is best framed by the counsel for Smith:

> The State's Proposed Instruction No. 11 was an instruction as to the definition of reasonable doubt. Counsel for the defendant did not object to the giving of this instruction. The State's Proposed Instruction No. 3 was an instruction directing the jury to not act upon sympathies or prejudices. Counsel for the Defendant did not object to the giving of this instruction. The State's Proposed Instruction No. 12 was an instruction directing the jury that a Defendant could not be convicted by conjecture or probability. Counsel for the Defendant did not object to the giving of this instruction. Prior to closing arguments, certain instructions were then read to the jury. In chambers, counsel for the Defendant then objected to the Court's failure to give State's Proposed Instruction Nos. 11, 3, and 12. The Court responded that the three proposed instructions were covered in the preliminary instructions given to the jury at the beginning of trial. Although the preliminary instructions were sent to the jury room, they were not read at the close of the trial. The question now becomes whether it was error to fail to give the State's Proposed Instruction Nos. 11, 3, and 12 or to read their equivalent from the preliminary instructions.

The majority opinion is egregiously in error in skipping over this vital issue.

A few years ago, we adopted, with a good deal of press hoopla, the American Bar Association Standards for Criminal Justice. Standard 15-3.6(e) provides:

> Before the taking of evidence, the court may give preliminary instructions to the jury deemed appropriate for their guidance in hearing the case. After the arguments are completed, the court should give the jury all necessary instructions.

The commentary provided with the Standards indicates the necessity for repeating some of the preliminary instructions:

> Even if certain instructions are given after the jury is sworn, it will nonetheless be necessary for the jury to be instructed before retiring for deliberations. The instructions given at this time will include at least some of the instructions given when the trial opened. The second sentence of paragraph (e) provides for these instructions to be given after final arguments.

(The Standard as adopted by us refers to instructions after arguments although that is not the procedure in our state courts. Under our practice, instructions are given to the jury before final arguments. Section 46-16-401(6), MCA.)

An identical situation was presented to the Arizona Court of Appeals in State of Arizona v. Marquez (Ariz.App. 1983), 660 P.2d 1243, 1249. There the Arizona Court reversed, saying:

> Since the burden of proof instruction was vital to appellant's defense, and since this error was called to the attention of the trial judge before the case was given to the jury, we hold that the court committed reversible error requiring a new trial.

> In order that there be no further confusion, we hold that the preliminary instruction of the jury, authorized by Rule 18.6(c), Rules of Criminal Procedure, is for the purpose of preparing the jury for the trial and constitutes an orientation process by which the jury is made to understand its duties and responsibilities. Where elementary legal principles that will govern the proceedings are given to the jury as part of the orientation, the trial judge must repeat all such legal principles in his charge to the jury, where such legal principles include matters of law vital to the rights of the defendant. (Emphasis added.)

660 P.2d 1249.

We adopted the American Bar Association Standards for Criminal Justice with a good deal of fanfare, and for good reason. Those Standards were the result of years of work to which judges, defense and prosecuting lawyers contributed mightily. The Standards represent the best thought of American jurisprudence with respect to proper procedure in criminal cases. Although we adopted those standards, we do not give them even lip service in this case.

I find further reversible error in the failure of the District Court to give defendant's proposed instruction no. 15, which would have told the jury how to regard evidence which is susceptible of two instructions or interpretations. Since this case depended so largely on circumstantial evidence, this particular jury instruction was vital to the defense and should have been given. See People v. Yrigoyen (Cal. 1955), 286 P.2d 1.

_____
                        Justice